STATE of Minnesota, Respondent,

v.

Gary VUE, Appellant.

No. A10–453.

Supreme Court of Minnesota.

April 27, 2011.

Lori Swanson, Attorney General, St. Paul, Minnesota; and Michael O. Freeman, Hennepin County Attorney, Linda K. Jenny, Assistant County Attorney, Minneapolis, Minnesota, for respondent.

David W. Merchant, Chief Appellate Public Defender, Benjamin J. Butler, Assistant State Public Defender, St. Paul, Minnesota, for appellant.

## OPINION

MEYER, Justice.

A Hennepin County grand jury indicted appellant Gary Vue with several felonies, including the offense of crime committed for the benefit of a gang (first-degree murder while committing drive-by shooting), Minn.Stat. §§ 609.185(a)(3), .229, subd. 2 (2010). A jury found Vue guilty. The district court convicted Vue and imposed a sentence of life in prison with the possibility of parole after 31 years. Vue directly appeals his conviction, claiming the district court erroneously admitted his statement to the police, the prosecutor committed

plain error during closing argument, and the State presented insufficient evidence to support his conviction for crime committed for the benefit of a gang. We affirm.

## I.

On July 10, 2001, Za Xiong was shot and killed in a drive-by shooting near Folwell Park in Minneapolis. The police interviewed witnesses who said they saw a red or maroon full-size pickup truck with Hmong men in the cab driving away from the scene of the murder. Shortly before the shooting, several Hmong teenagers saw a red or maroon full-size pickup truck near the park. Two Hmong men emerged from the truck, asked the teenagers what gang they "banged," and then attacked the teenagers with an ice scraper and flashlight.

In December 2005, police obtained a lead in the case and began investigating appellant Gary Vue as well as his brother Chong Vue (Chong) and Fong Vang for the murder of Xiong. The police learned that Chong owned a pickup truck that matched the description of the truck driven by the suspects in the drive-by shooting that killed Xiong and the assault on the group of Hmong teenagers that occurred prior to Xiong's murder. The police also learned that Vue was living in Sacramento, California.

Sergeant Bruce Folkens of the homicide unit of the Minneapolis Police Department, along with Detective Christopher Tayson of the Ramsey County Sheriff's Department, traveled to Sacramento. Folkens asked the Sacramento Sheriff's Department to set up an interview with Vue, emphasizing that "this [was] merely a request of Gary Vue to come in and talk to him; that he didn't have to; that we just merely were asking his permission if he would come in and talk to us." On March 14, 2006, Vue met with Folkens and Tayson at a Sacramento police station. When Folkens began to ask about the murder of Xiong, Vue terminated the interview and returned to his home.[1] Two days later, on March 16, 2006, Vue again met with Folkens and Tayson at the same Sacramento police station. Within eight minutes of beginning the second interview, Vue confessed that he "[p]ulled out the gun and shot" Xiong. The police did not arrest Vue at the conclusion of the second interview because they believed that California law prohibited the immediate arrest of a suspect who confesses in a noncustodial setting. Instead, the police drove Vue back to his home after the interview. Later that same day, March 16, 2006, Folkens obtained a warrant to arrest Vue. But when the police went to Vue's home to execute the arrest warrant, Vue was gone. A police investigation determined that Vue was a fugitive.

On July 27, 2006, a Hennepin County grand jury indicted Vue with several felonies, including the offense of crime committed for the benefit of a gang (first-degree murder while committing drive-by

---

1. Vue did not challenge the admissibility of the statements he made during the March 14, 2006, interview. Nevertheless, a brief description of the circumstances surrounding the March 14 interview helps place the challenged March 16, 2006, interview in context. During the March 14 interview, Folkens and Tayson were the only law enforcement officers present. Folkens told Vue, "I want you to understand that ... we have no arrest warrants, you are free to leave, okay, you don't have to talk to us." Folkens also told Vue that he would give Vue a ride home after the interview. Vue answered Folkens's questions until Folkens began to ask about the murder of Xiong that occurred near Folwell Park. Vue then asked if he was free to leave and whether he was under arrest. Folkens responded that Vue was free to leave. As Vue left, Folkens and Tayson both told Vue, "[i]t ain't over." Vue was then escorted to the lobby and given a ride home.

shooting). Nearly three years later, on March 2, 2009, the police apprehended Vue in St. Paul, Minnesota.

Vue pleaded not guilty and moved to suppress the statements he made during the March 16, 2006, police interview. Claiming the police subjected him to custodial interrogation during the March 16, 2006, interview, Vue argued the lack of a *Miranda* warning required suppression of his statements. At the suppression hearing, Folkens and Tayson testified about the circumstances surrounding the March 14 and March 16 police interviews. The district court denied Vue's motion to suppress, concluding that the "totality of the circumstances clearly demonstrate [Vue] was not in custody, and the police were therefore not required to advise him of his *Miranda* rights."

At trial, the State presented evidence consistent with the facts outlined above. Without objection, the prosecutor told the jury during his closing argument that Vue "has now lost that presumption of innocence as a result of the evidence that you have heard in this case" and that Vue was asking them to "believe the impossible." The prosecutor further stated without objection that defense counsel "was kind of channelling [Vue], kind of speaking for him. But I would remind you that the attorneys' words are not evidence. So unless it came from the witness stand, it is not something that you need to consider . . . ." The jury found Vue guilty. The district court convicted Vue and imposed a sentence of life in prison with the possibility of parole after 31 years.

Vue now appeals his conviction on three grounds. First, Vue contends that the district court erred when it denied his pretrial suppression motion. Second, he claims the prosecutor committed plain error during closing argument. Third, Vue asserts that the State presented insufficient evidence to support his conviction for crime committed for the benefit of a gang (first-degree murder while committing drive-by shooting). We will consider each of Vue's claims in turn.

## II.

We first consider whether the district court erred when it denied Vue's pretrial suppression motion. The parties do not dispute that the police failed to inform Vue of his *Miranda* rights when the police interviewed him on March 16, 2006. Vue also does not dispute on appeal that his statement was voluntary.[2] Therefore, the only issue before us is whether Vue was in custody when he gave his March 16 statement to the police.

Recognizing that both noncustodial and custodial interrogations can create a coercive environment, the United States Supreme Court has concluded that a *Miranda* warning is required as a procedural safeguard to protect a suspect's Fifth Amendment rights when the police subject a suspect to *custodial* interrogation. *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (citing *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). "An interrogation is custodial if, based on all the surrounding circumstances, a reasonable person under the circumstances would

2. We note that the district court made the following factual findings relevant to the voluntariness of Vue's March 16 interview. Vue was 24 years old and graduated from Sibley High School. He was a former employee of Thomson West Publishing, and when he worked at Thomson West, he read "portions of the law books published by the company." Vue was "not married but he has a daughter, and is mature enough to observe that he has failed to fulfill his parental responsibilities."

believe that he or she was in police custody of the degree associated with formal arrest." *State v. Thompson*, 788 N.W.2d 485, 491 (Minn.2010) (citation omitted) (internal quotation marks omitted); *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). In considering the totality of the circumstances, "no factor alone is determinative." *Thompson*, 788 N.W.2d at 491.

 Factors indicative of custody include (1) the police interviewing the suspect's at the police station; (2) the suspect being told he or she is a prime suspect in a crime; (3) the police restraining the suspects freedom of movement; (4) the suspect making a significantly incriminating statement; (5) the presence of multiple officers; and (6) "a gun pointing at the suspect." *State v. Staats*, 658 N.W.2d 207, 211 (Minn.2003). But the mere fact that an interrogation occurs at the police station does not by itself require a determination that the questioning was custodial in nature. *State v. Wiernasz*, 584 N.W.2d 1, 4 (Minn.1998) (citing *Mathiason*, 429 U.S. at 493–95, 97 S.Ct. 711). Similarly, a significantly incriminating statement does not automatically convert a noncustodial interrogation into a custodial interrogation. *State v. Heden*, 719 N.W.2d 689, 695 (Minn.2006).

 Alternatively, factors that may indicate the suspect is not in custody include (1) questioning the suspect in his or her home; (2) law enforcement expressly informing the suspect that he or she is not under arrest; (3) the suspect's leaving the police station without hindrance; (4) the brevity of questioning; (5) the suspect's ability to leave at any time; (6) the existence of a nonthreatening environment; and (7) the suspect's ability to make phone calls. *Thompson*, 788 N.W.2d at 491–92. An officer's unarticulated decision not to let the suspect leave at the end of an interrogation, however, has no bearing on the question of whether a suspect was in custody. *Berkemer*, 468 U.S. at 442, 104 S.Ct. 3138.

 The clearly erroneous standard controls our review of a district court's factual findings regarding the circumstances surrounding an interrogation. *Thompson*, 788 N.W.2d at 491. We independently review a district court's legal conclusions regarding custody and the need for a *Miranda* warning. *Wiernasz*, 584 N.W.2d at 3; *see also State v. Chavarria–Cruz*, 784 N.W.2d 355, 363 (Minn.2010) (explaining that the de novo standard controls our review of a district court's legal conclusions).

In denying Vue's motion to suppress, the district court made the following factual findings regarding the circumstances immediately preceding the March 16, 2006, interview. On the morning of March 16, 2006, eight armed Minneapolis and Sacramento police officers executed a search warrant on the Vue family home in Sacramento. Vue was the only individual at home when the police executed the search warrant. The police handcuffed and placed Vue in the kitchen for fifteen minutes. During this time, Detective Tayson told Vue he was a suspect in a homicide and that "[t]his is not going away." Vue was then "later permitted to walk, unrestrained, in the yard." While the officers were searching the home, "Vue agreed to be interviewed." Vue went to the police station voluntarily. He sat, unrestrained, in the front seat of the squad car on the way to the police station. The detectives "asked [Vue] to be seated in the lobby while the officers looked for an interview room. He could have left at that time, but chose not to do so."

The district court then made the following factual findings regarding the environ-

ment of the March 16, 2006, interrogation. "The tone of the interview was understated, even friendly. [Vue] was not handcuffed. He was told he was not under arrest, and that he would not be arrested on that date. In fact, after the interview was over, officers gave [Vue] a ride home." During the interview, "Vue was permitted to use the restroom, and to take a cigarette break. He was asked whether he needed anything to drink or to eat on more than one occasion. At no time did [Vue] say that he wanted to leave, or didn't want to continue the interview." [3] Vue knew how to exercise his right to terminate the interview because he did so two days earlier when the police interviewed him and this conduct was "consistent with his maturity, intelligence, and educational level." During the interview, Vue "exhibited his independence," when he retorted, "What are you trying to get me to say, did I kill for the gang? No, I didn't kill for no gang, you know."

We will not disturb the district court's factual findings because the record supports the findings and we are not left with the definite and firm conviction that a mistake has been made. *See State v. Evans*, 756 N.W.2d 854, 870 (Minn.2008). We note that the district court did not make a factual finding on the issue of whether Vue had access to his cell phone prior to and during the interview.[4] For purposes of our analysis, we will assume the police denied Vue access to his cell phone prior to and during the interview.

Applying the factors set forth in *Thompson* to the district court's factual findings, we conclude that Vue was not in custody during the March 16, 2006, interview. Although the questioning occurred at a police station, Vue voluntarily went to the station to give a statement to police. Vue rode to the police station in the front seat of the squad car, unhandcuffed and smoking a cigarette with the window down, and the officers left Vue alone in the lobby of the police station while they looked for an interview room. Vue could have left the station at that time, but chose to stay. Although the officers briefly handcuffed Vue during the execution of the search warrant at Vue's home, this fact by itself does not alter our analysis, especially because the officers permitted Vue to walk unrestrained in his yard after the protective sweep of the home was complete.

The police expressly informed Vue that he was not under arrest. Specifically, the police told Vue he was not under arrest during the execution of the search warrant and twice more before the interview began.

During the interview, the police did not restrain Vue's freedom of movement and Vue was able to leave the police station without hindrance. Vue was not handcuffed. The officers told Vue that they would provide him with a ride home after the interview if he desired. The police allowed Vue to use the restroom and to

3. Although not expressly mentioned by the district court, the record indicates that the police escorted Vue to the smoking area and remained with Vue during the smoke break.

4. Vue testified at the suppression hearing that he asked the detectives if he could call his brother, Chu, before the March 16 interview, and they "just told me they wouldn't let me call him, and they didnt have the number." The record suggests that Vue had not memorized Chu's telephone number because the

number was stored in Vue's cell phone. But when Vue arrived at the police station on March 16, Vue no longer possessed his cell phone because Vue turned his cell phone over to the police during the execution of the search warrant. The police requested Vue's cell phone during the search so they could look up the telephone number for Vue's sister, who possessed the keys to a vehicle that was included in the search warrant.

take a cigarette break. Although the police accompanied Vue through secured areas of the police station and on Vue's smoke break, at no time did Vue ever say that he wanted to leave, or that he did not want to continue the interview. There is no doubt that Vue knew how to exercise his right to terminate the interview because he did so two days earlier. Vue freely left the police station at the close of the interview, accepting the officers' offer for a ride home. The officers did not stay with Vue at his home nor did they set up surveillance around his home.

We agree with the district court's conclusion that the tone of the interview "was understated, even friendly." There were only two officers present in the interview room and the officers never drew their guns. Vue chose to confess to the shooting eight minutes after the interview began. After Vue confessed to shooting Xiong, the police did not attempt to restrain Vue or otherwise alter the interview environment. Although Vue's ability to call his brother was arguably impeded by the absence of his cell phone, the significance of this factor is lessened by the fact that Vue was not generally denied access to a telephone. Vue not only knew how to exercise his right to terminate the interview and leave the station, Vue had an opportunity to leave the station lobby before the interview began.

Because we conclude that the totality of the circumstances demonstrates that Vue was not in custody when he gave his March 16 statement to the police, the officers were not required to read Vue a *Miranda* warning. Thus, we affirm the district court's denial of Vue's suppression motion.

### III.

▮▮▮ We next turn to whether the prosecutor committed plain error in closing argument. Vue concedes that he did not object to any of the alleged prosecutorial errors. We therefore analyze the alleged errors under our modified plain error test. *State v. Ramey*, 721 N.W.2d 294, 297–98 (Minn.2006). Under this test, a defendant must demonstrate that the prosecutor committed an error that was plain. *Id.* at 302. An error is "plain" if it is clear or obvious. *State v. Cao*, 788 N.W.2d 710, 715 (Minn.2010). Typically, a plain error contravenes case law, a rule, or a standard of conduct. *Id.* If the defendant establishes an error that is plain, the burden shifts to the State to demonstrate the error did not "prejudice the defendant's substantial rights." *Ramey*, 721 N.W.2d at 300. If the State is unable to meet its burden, we must decide whether the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Johnson v. United States*, 520 U.S. 461, 469, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997), *cited in State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998).

### A.

▮▮▮ Vue first contends that the prosecutor committed plain error when she told the jury Vue had lost the presumption of innocence by the time the prosecutor delivered her closing argument. In her closing argument, the prosecutor stated:

As the Judge has told you, the Defendant is presumed innocent, just like any defendant in any criminal case, presumed innocent until—unless and until proven guilty beyond a reasonable doubt. The Defendant has now lost that presumption of innocence as a result of the evidence that you have heard in this case.

. . . .

In this case, ladies and gentlemen, based upon the testimony that we have heard and the evidence that we have seen, our

reason and common sense tell us that Gary Vue committed the crimes that he is accused of, the First and Second Degree Drive–By Shooting Murder of Za Xiong Committed for Benefit of a Gang. That is clear beyond a reasonable doubt. Therefore, the Defendant has lost his presumption of innocence.

Vue characterizes the prosecutor's statements as misstating the proper burden of proof. We need not, and do not, decide whether the prosecutor erred in her description of the State's burden of proof because any alleged error was not plain or obvious.

We acknowledge that the prosecutor's statements are similar to the statements made in *State v. Bohlsen*, 526 N.W.2d 49, 49–50 (Minn.1994), which we held improperly stated the burden of proof.[5] In *Bohlsen*, we concluded that the prosecutor's statements mocked the presumption of innocence. *Id.* at 50. But the prosecutor's statements in this case are also similar to the statements in *State v. Young*, 710 N.W.2d 272, 281 (Minn.2006), which we held did not improperly misstate the burden of proof. In *Young*, we explained that, "[r]ead in context ..., the prosecutor's argument appears to be that the *state had produced sufficient evidence of Young's guilt to overcome the presumption of innocence*, not that he was not entitled to the presumption in the absence of proof beyond a reasonable doubt." *Id.* at 280–81 (emphasis added). We further stated that our interpretation of the prosecutor's

statements in *Young* was consistent with the language in the criminal jury guides used in Minnesota to explain the presumption of innocence. *Id.* at 281 (citing 10 Minn. Dist. Judges Ass'n, *Minnesota Practice–Jury Instruction Guides, Criminal,* CRIMJIG 3.02 (4th ed. 1999) ("The defendant is presumed innocent of the charge made. This presumption remains with the defendant unless and until the defendant has been proven guilty beyond a reasonable doubt.")).

In light of our decision in *Young* and CRIMJIG 3.02, we conclude that Vue failed to demonstrate that the prosecutor's alleged misstatement of the burden of proof was plain or obvious. Nevertheless, we caution prosecutors about the use of such language in their closing argument and urge them to "adhere as closely as possible to the normal statement of the presumption [of innocence]." *Bohlsen,* 526 N.W.2d at 50; *see also State v. Sauer,* 38 Minn. 438, 439, 38 N.W. 355, 356 (1888) (explaining that "[w]here any explanation of what is meant by a reasonable doubt [or the presumption of innocence] is required, it is safer to adopt some definition which has already received the general approval of the authorities, especially those in our own state").

**B.**

■■■ Vue also contends the following statements made by the prosecutor during her closing argument "improperly dispar-

---

5. In *Bohlsen,* we held that the following statement was improper:

> The State of Minnesota brought these charges against the defendant. Therefore, doesn't it make sense that the State should have the burden, and that the defendant should not be required to prove his innocence? That makes sense. But keep in mind the State accepts this burden. It's not an unrealistic burden, it's not an impos-

sible burden; rather, it's truth beyond a reasonable doubt, not proof beyond all doubt or to a mathematical certainty.

. . . .

But, now, when does the defendant no longer enjoy this presumption of innocence? It's when you ladies and gentlemen of the jury are satisfied that the State has proved its case beyond a reasonable doubt, not all doubt.

526 N.W.2d at 49–50 n. 1.

age[d]" and belittled his "defense to the charges," and therefore constituted plain error:

> Ladies and gentlemen, the Defendant is asking you to do something that is— could be stated this way, believe the impossible. Make no mistake, you would have to believe the impossible to believe that the Defendant was not the killer of Za Xiong.
>
> . . . .
>
> Ladies and gentlemen, you were told that if you think that Gary Vue might have admitted to a crime he didn't commit then you should find him not guilty. That is what I would characterize as asking you to believe the impossible. To believe that he might have admitted to something that he didn't do is to believe the impossible in this case because we know from all the circumstances of the confession, as well as the words of the confession and his demeanor, his confidence, we know from all of those things the fact that he knew all of the circumstances, where those shots were fired from, every single detail right on with the scene, we know from all of those pieces that this was not only a voluntary confession, it was a true confession. Our reason and common sense don't allow us to believe the impossible.

Vue asserts that it would not be "impossible" for the jury "to believe that the State had not met its burden of proving [his] guilt beyond a reasonable doubt." Vue also contends that it was not impossible to believe that someone would confess to a crime the person did not commit because studies show that individuals confess to crimes they do not commit.

For its part, the State contends in its brief that the prosecutor was merely making the comment that it would be impossible for the jury to believe the defendant confessed to a crime he did not commit

because "the evidence belied [Vue's] incredible defense that his detailed confession was false." The State asserts that the prosecutor supported her statements with a detailed discussion to the jury of the circumstances surrounding the confession.

 Prosecutors may comment on the adequacy of evidence presented at trial during closing arguments. *State v. Salitros*, 499 N.W.2d 815, 818 (Minn.1993) (explaining that "a prosecutor is free to specifically argue that there is no merit to a particular defense in view of the evidence or no merit to a particular argument"). But prosecutors "must avoid inflaming the jury's passions and prejudices" against defendants, *State v. McDaniel*, 777 N.W.2d 739, 752 (Minn.2010) (citation omitted) (internal quotation marks omitted), and avoid "belittl[ing] the defense," *State v. Martin*, 773 N.W.2d 89, 108 (Minn.2009). We consider the closing arguments in their entirety in determining whether prosecutorial misconduct occurred. *State v. Walsh*, 495 N.W.2d 602, 607 (Minn.1993) ("We look ... at the closing arguments as a whole, rather than just selective phrases or remarks that may be taken out of context or given undue prominence."). In *State v. Starkey*, we held that it was error for the prosecutor to state during closing arguments, "I mean, I find that impossible to believe that, if that is in fact the fact," when discussing his personal opinion regarding the defendant's credibility. 516 N.W.2d 918, 928 (Minn.1994).

When the prosecutor's comment is viewed in light of the entire argument, the comment merely explains why the jury should reject the defense's argument that Vue falsely confessed. *Cf. Salitros*, 499 N.W.2d at 818. The prosecutor explained right after the "believe the impossible" comment why the circumstances of the confession, specifically Vue's demeanor and confidence in the interview and "the

fact that he knew all of the circumstances," necessitated such a belief. Moreover, unlike the comment in *Starkey*, 516 N.W.2d at 928, the prosecutor's comment did not express a personal opinion. We therefore conclude that this statement was not prosecutorial misconduct.

### C.

■ Vue also contends the prosecutor committed plain error when she alluded in her closing argument to the fact that Vue declined to testify. The prosecutor said the following:

> You actually heard over the past half hour a lot of it may be that and I would tell you that. You heard a lot of speculation from the Defense attorney. You also heard a lot of times when the Defense attorney was kind of channelling the Defendant, kind of speaking for him. But I would remind you that the attorneys' words are not evidence. So unless it came from the witness stand, it is not something that you need to consider in your examination of the evidence in this case and your determination of whether there is proof beyond a reasonable doubt.

Vue characterizes this statement as the prosecutor "calling the jury's attention to the fact that the defendant did not take the witness stand."

■ It is error for the "prosecutor at a defendant's trial [to] allude to the defendant's failure to testify." *State v. Whittaker*, 568 N.W.2d 440, 451 (Minn. 1997) (citing *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965)). Indirect statements made by prosecutors referring to a defendant's failure to testify are "prohibited if they either (1) manifest the prosecutor's intention to call attention to the defendant's failure to testify, or (2) are such that the jury would naturally have understood them as a com-

ment on defendant's failure to testify." *State v. DeRosier*, 695 N.W.2d 97, 107 (Minn.2005) (citation omitted) (internal quotation marks omitted).

There is no indication that the statements manifested the prosecutor's intention to bring to the jury's attention Vue's failure to testify or that the jury would understand them as a reference to Vue's failure to testify. Further, Vue's assertion that the misconduct arose when the prosecutor referenced "the Defendant" and "the witness stand" in the same statement is too attenuated for the jury to have understood them to be a comment on Vue's failure to testify. Instead, the more reasonable interpretation of the prosecutor's statements is that the prosecutor merely reminded the jury that it cannot use an attorney's statements in closing argument as evidence because such statements do not "[come] from the witness stand." The prosecutor's statements did not constitute prosecutorial misconduct because the prosecutor did not allude to the defendant's failure to testify, *see DeRosier*, 695 N.W.2d at 107, and because the prosecutor has the right to respond to the arguments made by the defendant, *see State v. Jackson*, 773 N.W.2d 111, 123 (Minn.2009).

### IV.

■ We next turn to Vue's argument that the State failed to present sufficient evidence to support his conviction of crime for the benefit of a gang. The parties offer competing interpretations of the language contained in the crime-for-the-benefit-of-a-gang statute, Minn.Stat. § 609.229, subd. 2.

■ The de novo standard controls our review of statutory interpretation issues. *State v. Loge*, 608 N.W.2d 152, 155 (Minn.2000). The threshold issue in any statutory interpretation analysis is wheth-

er the statute's language is ambiguous. *State v. McCoy,* 682 N.W.2d 153, 158–59 (Minn.2004). A statute is ambiguous if its language is subject to more than one reasonable interpretation. *State v. Mauer,* 741 N.W.2d 107, 111 (Minn.2007). If the meaning of the statute is "clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit." Minn.Stat. § 645.16 (2010), *quoted in Loge,* 608 N.W.2d at 155. When analyzing the plain and ordinary meaning of words or phrases, we have considered dictionary definitions. *See State v. Hartmann,* 700 N.W.2d 449, 453–54 (Minn.2005). We will not read into a statute a requirement that the Legislature by its plain language has left out. *See State v. McCormick,* 273 N.W.2d 624, 627 (Minn.1978) ("[W]e are not at liberty to read into [a criminal statute] language intentionally omitted when it was amended by the legislature.").

We begin our analysis by reviewing the relevant statutory language. Minnesota Statutes § 609.229, subdivision 2, provides: "A person who commits a crime for the benefit of, at the direction of, in association with, or motivated by involvement with a criminal gang, *with the intent to promote, further, or assist in criminal conduct by gang members is guilty of a crime....*" (Emphasis added.) Vue contends that we should read the phrase "criminal conduct" as requiring the State to prove that Vue committed the drive-by shooting with the intent to promote, further, or assist gang members in the commission of other specific and identifiable criminal acts. The State persuasively argues that the second clause of the statute describes the mens rea (guilty mind) required at the time the person commits the actus reus (wrongful deed). In other words, the person must act with the intent of furthering the gang's criminal activities when he commits the criminal act. The State contends that

"[t]he fact that the same evidence demonstrated both the latter clauses or elements in this case does not render either clause or element 'superfluous.' "

■ We conclude that Vue's interpretation of the statutory language is unreasonable because it requires us to read into the statute an intent to promote, further, or assist in an additional specific criminal act, a requirement which the Legislature by its plain language has left out. An "act" is defined as "[s]omething done or performed." *The American Heritage Dictionary of the English Language* 16 (4th ed.2009). The word "conduct," however, is commonly understood to have a broader meaning: "[t]he *way* a person acts." *Id.* at 384 (emphasis added). If the Legislature intended to refer to an additional specific act of criminal conduct, it could have used the phrase "additional criminal acts." But the Legislature chose to use the phrase "criminal conduct." Under the plain language of Minn.Stat. § 609.229, subd. 2, the State was not required to show that Vue committed the drive-by shooting with the intent to promote, further, or assist gang members in the commission of other specific and identifiable criminal acts. Instead, the State was required to prove that Vue intended to further the gang's criminal activities when he committed the drive-by shooting.

■ We next consider whether the evidence presented by the State satisfied the plain language of Minn.Stat. § 609.229, subd. 2. In assessing the sufficiency of the evidence, we review the evidence to determine "whether the facts in the record and the legitimate inferences drawn from them would permit the jury to reasonably conclude that the defendant was guilty beyond a reasonable doubt of the offense of which he was convicted." *State v. Moore,* 481 N.W.2d 355, 360 (Minn.1992). In do-

ing so, we view "the evidence in the light most favorable to the State and will assume that the jury believed the State's witnesses and disbelieved contrary evidence." *Id.*

Vue concedes that the evidence was sufficient to prove that he committed first-degree drive-by shooting, that he committed the drive-by shooting for the benefit of, at the direction of, in association with, or motivated by involvement with a criminal gang, and that the State provided evidence that the OMB gang commits violent crimes to enhance the reputation and strength of the gang.[6] Therefore, the only remaining issue is whether Vue acted with the intent of furthering one of the OMB gang's primary activities. The State relies on Vue's confession, the assault on the Hmong teenagers shortly before the shooting, and the stipulation that a primary activity of the OMB gang was to engage in the commission of crimes and a pattern of criminal activity.

After reviewing the evidence in the light most favorable to the verdict, we conclude the record supports the jury's verdict that the State proved beyond a reasonable doubt that Vue acted with the intent of furthering one of OMB's primary activities—committing violent crimes to enhance the reputation and strength of the gang—when he committed the drive-by shooting. First, both parties entered into a stipulation at trial that "[o]ne of the primary activities of the OMBs is the commission of crimes.... The OMBs include members who individually or collectively engage in a pattern of criminal activity." Second, the State provided evidence that OMB commits violent crimes to enhance the reputation and strength of the gang. Third, during his confession, Vue made numerous statements regarding his intent when he shot Vue. Vue stated that they intention-

ally chased Xiong's car down because they thought Xiong belonged to a rival gang. Vue also stated, "[t]hat's just, that just how the gang go, ya know. Either it's his life or my life, ya know." Fourth, there is evidence that the group's purpose that night was to contribute to the progress of criminal conduct. This is evidenced by the attack on the Hmong teenagers moments before the murder. Vue and Chong demanded that the teenagers tell them what gang they "bang" and roll up their shirts to reveal their tattoos. They also assaulted the teenagers with an ice scraper and a flashlight before Vue engaged in the drive-by shooting. Because the State presented sufficient evidence to support Vue's conviction of crime committed for the benefit of a gang, we affirm.

Affirmed.

---

6. Vue was a member of the OMB gang at the time of the shooting.