STATE of Minnesota, Respondent,

v.

Steven Bernard RADKE, Appellant.

Nos. A09–0834, A11–2007.

Supreme Court of Minnesota.

Sept. 12, 2012.

318

320

Lori Swanson, Attorney General, St. Paul, MN, Donald F. Ryan, Crow Wing County Attorney, Brainerd, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Benjamin J. Butler, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

PAGE, Justice.

Appellant Steven Bernard Radke was arrested and charged with first-degree premeditated murder, in violation of Minn. Stat. § 609.185(a)(1) (2010), for causing the June 20, 2007, death of Darrell Buesgens. At trial, Radke admitted shooting Buesgens, but claimed that he did so in self-defense and without premeditation. The jury, rejecting Radke's self-defense claim, found Radke guilty of first-degree premeditated murder, and the district court sentenced Radke to life in prison without the possibility of release. Radke thereafter filed a petition for postconviction relief, which the postconviction court denied. In this consolidated direct appeal and appeal from the denial of postconviction relief, Radke argues that: (1) his trial counsel was ineffective for failing to introduce evidence of Buesgens' reputation for violence and past acts of violence; (2) the State committed reversible error when it withheld exculpatory evidence; (3) the jury instructions impermissibly shifted the burden to Radke to prove self-defense; (4) the district court erred in refusing to instruct the jury on heat-of-passion manslaughter;

(5) the State improperly used a suppressed statement by Radke, admitted solely for purposes of impeachment, as substantive evidence of guilt; (6) the State committed misconduct during closing argument; and (7) the cumulative effect of the above errors denied Radke a fair trial. Because we conclude that each of these claims is either without merit or did not result in prejudice to Radke, we affirm both Radke's conviction and the postconviction court's denial of postconviction relief.

## I.

The record indicates that Radke shot and killed Buesgens in the yard of Buesgens' home on June 20, 2007. Buesgens' daughter, M.B., was married to Radke and was present at the time of the shooting. Because of problems in their marriage, M.B. and the three children from Radke's and M.B.'s blended family had moved out of the marital home and had been staying at Buesgens' home with her mother and father since February 2007. Testifying in his own defense at trial, Radke claimed that he and M.B. had talked about M.B. moving back to the marital home, but Buesgens was upset by the idea. According to Radke, on June 20, M.B. asked Radke to come to her parents' house to help her move back to the marital home. M.B. needed help because she was afraid that Buesgens would try to stop her. Radke testified that he was afraid of Buesgens and was reluctant to go to Buesgens' house because Buesgens was bigger and stronger than Radke, was experienced with firearms, and had threatened Radke several times in the past, telling Radke to leave M.B. alone and move out of town or he "would be sorry." Buesgens had also said that he was going to get Radke eventually; that he "would come at night, stealth, and pound nails into [Radke and his] kids' head[s] with a hammer." Radke was also

afraid because, on the morning of June 20, Buesgens had blocked him in at a gas station, came up to him, pointed his finger at him, and told him that M.B. was not going to come back and that Buesgens was going to kill him and kill his kids.

Radke contends that, at some point, he became afraid for M.B. and the kids and decided to go over to Buesgens' house. Rather than drive his car, he drove to the Buesgens' property on his ATV, which he parked in the woods so that Buesgens would not see the ATV if he returned home. Radke took a loaded rifle with him because he knew Buesgens had guns and was afraid that Buesgens might try to kill him. Radke testified that he did not intend to use the rifle, except to brandish it, if necessary, to get Buesgens to back down. According to Radke, he loaded the rifle because he was scared, and because an unloaded gun "wouldn't do [him] much good."

Radke testified that when he arrived at Buesgens' house, he found M.B. standing outside smoking and he told her "let's go, let's get out of here." But soon thereafter, Radke heard Buesgens' truck approaching, and M.B. told him to go and hide. Radke ran down a hill on the side of the house and hid about 50 feet from where Buesgens and M.B. ended up talking. Radke testified that, as he lay on the ground scared, he thought about running away, but from his vantage point, he could only see the top of Buesgens' head and could not see if Buesgens was armed.

Radke said that he did not stand up and announce to Buesgens that it was him or attempt to reason with Buesgens, because he panicked and "didn't think of that." Radke also said that he could not have run because there was no surrounding cover and Buesgens would not have missed him with his shotgun from only 20 feet away. While he laid there, Radke shifted his position and his rifle accidentally discharged. Radke again thought about running, but did not. He continued to lay there scared. A minute or two later, Radke heard a noise to his right and saw Buesgens standing at the top of the hill with a shotgun, looking around and panning toward Radke's location. Radke testified that he thought Buesgens was going to shoot him, that he had no way out, and that "either I pull the trigger or I die." Radke therefore picked up his rifle and moved it toward Buesgens, who turned his head and began swinging his shotgun around toward Radke's location. Then Radke fired his rifle causing Buesgens to take a step back. According to Radke, Buesgens then "went to draw down" on Radke again. As this was taking place, Radke said to Buesgens that "it don't have to be this way," to which Buesgens responded, "you are a dead son of a bitch." Then, as Buesgens was "trying to—laboring to bring the gun back on [Radke]," Radke looked through the scope of his rifle and shot Buesgens a second time.

M.B.'s version of events was starkly different. She testified that when she talked to Radke on the phone the morning of June 20, he complained that it was unfair that she and the kids were staying at her parents' house. Radke also said that he was out in the woods, that he was going to drink to the point of alcohol poisoning, and that M.B. should come out and stay with him. M.B. told Radke that he could be a coward if he wanted, but that she was not coming out to help him. M.B. also told Radke that she had filed for divorce [1] and was never coming back, and then hung up.

---

1. By the time of trial, M.B.'s divorce from Radke was final, and Radke raises no objection to M.B.'s testimony about statements made while their marriage was still ongoing. We therefore need not consider the admissibility of those statements here.

She denied asking Radke to come over to the Buesgens' house to help her leave.

M.B. further testified that she and Buesgens were smoking and talking outside the Buesgens' house while one of the kids was playing in a nearby sandbox and the others were finishing their lunch inside when they heard a gunshot, which "sounded pretty close." Buesgens told M.B. to go inside and Buesgens went to get his gun. Buesgens then went back outside, and M.B. heard "pop, pop." She heard Buesgens yelling her name and when she looked out the door, she saw Buesgens crawling on his hands and knees, his face bloody. Another shot was fired and Buesgens dropped. M.B. was calling 911 when Radke entered the house. She said that Radke was waving his gun around and asked if she had called the police. Radke proceeded to rip the phones out of the wall and told M.B. to pack some things because they were going to Mexico. As Radke was unloading the guns and placing them in the trunk of M.B.'s car, the police arrived and ordered them both to the ground.

When the police arrived, they found toiletries, diapers, a basket full of clothing, and a file folder in the trunk of M.B.'s car. Officers also found the answering machine for the Buesgens' home phone line unplugged and two phones out in the grass. Two empty cartridges matching Radke's rifle were found on the hill leading down from the house. Buesgens' body was located in front of a white shed at the top of the hill, 48 feet away from the expended cartridges.

While Radke was detained at the scene, he made a number of incriminating statements. Among other things, Radke stated:

She didn't have nothing to do with what I did . . . He tried to run me down today . . . I'm sorry, but I'm not sorry that prick's dead . . . he'll never threaten my life again ever . . . She had nothing to do with this . . . He came after me with a shotgun . . . told me everyday for months he was going to put 16 pennies into my head when I was sleeping . . . he was going to kill me eventually, but you know what, he'll never threaten my life again . . . he was gonna kill me . . . he'll never get away with it though because I came over here and planned it and murdered him . . . he deserved what he got too . . . shouldn't have threatened me so many times . . . I didn't sleep the last three weeks was up all night waiting for him to come shove 16 penny nails in my forehead . . . but he never did that and I murdered him outright I guess . . . I don't know how I did what I did . . . I just couldn't take those nails anymore . . . Tried to run me off the road . . . pointed his finger at me like it was a gun . . . I was afraid . . . I didn't mean to kill anybody . . . I didn't mean to hurt anybody . . . Run me off the road and threatened to put 16 penny nails in my forehead when I'm sleeping . . . I'm scared and everyone in town told me he would do it too . . . I'm not a murderer, but I murdered a man today in cold blood . . . how did this happen. . . .

At trial, Radke disavowed some of these statements, saying that he was a wreck at the time and that he was just trying to protect M.B. from any responsibility for the killing.

The medical examiner testified that Buesgens died as a result of two high-velocity gunshot wounds. The medical examiner concluded that one shot entered and exited Buesgens' right arm, creating "a blowout type wound" that resulted in extensive fracturing of the elbow bone and tearing of the muscles. That shot then reentered at Buesgens' chest and exited his back left side. The other shot entered Buesgens' right cheek and grazed along the front of

his skull, causing a shock to the brain. Because the medical examiner concluded that Buesgens could not have moved or had any meaningful, physical, intentional activity following this shot, it was her opinion that the shot to the face must have come second. The medical examiner indicated that it was her opinion that, at the time Buesgens was shot in the arm, Buesgens was holding the shotgun with his right arm, with his right elbow out from the body and facing the shooter. But she was not able to determine which direction Buesgens' head was turned at the time. And an impression from the butt of the shotgun found on Buesgens' right sternum was consistent with the gun facing slightly right—toward the direction from which he was shot.

The jury found Radke guilty of first-degree premeditated murder, and the court sentenced him to life in prison without the possibility of release. Radke filed a direct appeal and, while his appeal was pending, moved to stay the direct appeal so that he could file a petition for postconviction relief. We granted Radke's motion. After Radke filed a postconviction petition and following an evidentiary hearing on the petition, the postconviction court denied relief. We subsequently reinstated Radke's direct appeal and consolidated it with his appeal from the denial of his petition for postconviction relief.

## II.

■ We first address Radke's postconviction claim that trial counsel was ineffective for failing to introduce evidence of Buesgens' reputation for violence and past acts of violence.[2] Specifically, Radke ar-

gued that counsel should have introduced certain evidence that: Buesgens had committed multiple acts of domestic abuse; Buesgens had a reputation for violence; Radke knew of both Buesgens' reputation for and past acts of violence; and Buesgens also had a reputation for violence within the law enforcement community. Radke argues that this evidence was crucial to his claim of self-defense, and that, had it been admitted, the result of the trial likely would have been different.

■ Because it involves mixed questions of law and fact, we review Radke's claim of ineffective assistance of counsel de novo. *State v. Rhodes*, 657 N.W.2d 823, 842 (Minn.2003). To establish ineffective assistance, Radke must show two things: (1) that trial counsel's performance fell below an objective standard of reasonableness; and (2) that a reasonable probability exists that, but for counsel's errors, the outcome of the proceeding would have been different. *See Williams v. State*, 764 N.W.2d 21, 29–30 (Minn.2009) (citing *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). If either prong of this two-part test is not met, the claim fails. *Id.* at 30; *see also Strickland*, 466 U.S. at 697, 104 S.Ct. 2052 (noting that "there is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one"). Here, we conclude that Radke's claim fails to meet the prejudice prong of the *Strickland* test; that is, Radke has not established that there is a "reasonable probability that, absent [trial counsel's] errors, the factfinder would have

2. In the alternative, Radke argues that the trial court erred in excluding the evidence in question. However, our reading of the record confirms the view of the postconviction court: that the trial court never, in fact, ruled on the State's request to prohibit certain evidence of Buesgens' violence, and that trial counsel ultimately conceded that the evidence should be excluded. We therefore analyze this claim as one of ineffective assistance of counsel, and not for trial court error based on the exclusion of evidence.

had a reasonable doubt respecting guilt." *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052.

At trial, it was undisputed that Radke shot and killed Buesgens. And assuming Radke's version of events to be true, there is ample evidence that the killing was premeditated and not in self-defense. Radke went to Buesgens' house with a loaded rifle with a bullet cycled into the chamber; he cycled a new bullet into the chamber after the rifle accidentally discharged; he made no effort to flee the scene or otherwise retreat either before or after the rifle accidentally discharged; after firing the first shot that struck Buesgens, Radke took aim through the scope of his rifle, paused, and warned Buesgens before shooting him a second time. *Cf. State v. Palmer,* 803 N.W.2d 727, 734–37 (Minn. 2011) (describing prior possession of the murder weapon, careful aim at the victim, and a pause between shots as evidence of premeditation); *Bangert v. State,* 282 N.W.2d 540, 544 (Minn.1979) (concluding that the jury's finding of premeditation was "clearly justified" when the defendant procured a rifle, walked down the hallway, took careful aim, and pulled the trigger three times).

▮ Radke generally argues that the evidence he claims should have been admitted would have supported his self-defense claim. A valid claim of self-defense requires the existence of four elements: (1) the absence of aggression or provocation on the part of the defendant;[3] (2) the defendant's actual and honest belief that he was in imminent danger of death or great bodily harm; (3) the existence of reasonable grounds for that belief; and (4) the absence of a reasonable possibility of retreat to avoid the danger. *State v. Johnson,* 719 N.W.2d 619, 629 (Minn.2006). Although the defendant must come forward with evidence to support his claim, it is the State that bears the ultimate burden of disproving self-defense. *State v. Basting,* 572 N.W.2d 281, 286 (Minn.1997). To meet its burden, however, the State need only disprove beyond a reasonable doubt at least one of the elements of self-defense. *See Johnson,* 719 N.W.2d at 629.

Radke primarily focuses on his "actual and honest belief that he was in imminent danger of death or great bodily harm" from Buesgens and that his belief was reasonable. Ultimately, we need not determine whether trial counsel's failure to introduce that evidence fell below an objective standard of reasonableness because we conclude that, even under Radke's version of the facts, the State met its burden of disproving the separate self-defense element of absence of aggression or provocation by defendant. We therefore conclude that Radke suffered no prejudice from trial counsel's alleged failure to introduce the evidence.

▮ As noted, a valid claim of self-defense requires the absence of aggression or provocation by the defendant. Radke argues that in this case it was Buesgens, not him, who was the aggressor. According to Radke, Buesgens became the aggressor when Buesgens showed up at the top of the hill with a shotgun one to two minutes after Radke's rifle accidentally discharged. At oral argument, counsel for Radke conceded, as he had to, that up to that point Radke's conduct made Radke

---

**3.** Although a defendant who is the first aggressor ordinarily is not entitled to claim self-defense, the right to self-defense will be revived if the defendant "actually and in good faith withdraws from the conflict and communicates that withdrawal" to the victim. *Bellc-* *ourt v. State,* 390 N.W.2d 269, 272 (Minn. 1986). But, "[i]f the circumstances are such that it is impossible for [the] defendant to communicate the withdrawal, 'it is attributable to his own fault and he must abide by the consequences.' " *Id.* (citations omitted).

the aggressor. To conclude on these facts that Buesgens was the aggressor would require us to first conclude that Buesgens, who was lawfully on his own property when a high-powered rifle was discharged less than 50 feet away, acted unreasonably in defense of himself, his daughter, and his grandchildren who were present at his house. It would also require us to ignore the fact that before Buesgens was shot the first time, Buesgens had done nothing more than retrieve a shotgun and go to the area where the rifle shot came from to try to ascertain what was going on. To the extent that, as Radke claims, Buesgens sought to bring the shotgun around to "draw down" on Radke after Buesgens had been shot the first time, Buesgens presumably was attempting to defend himself from exactly what took place next: being shot a second time. Thus, on the record before us, we can only conclude that Buesgens was not the aggressor, nor did he provoke the circumstances leading up to his being shot.

Moreover, Radke's own testimony leads inescapably to the conclusion that Radke was the aggressor who provoked the events leading to Buesgens' death. Radke testified that he knew that Buesgens might return home while he was there and that Buesgens would be upset if he saw M.B. and the kids trying to leave with Radke. Radke also testified that he knew that Buesgens had warned him to stay away from M.B. and the Buesgens' home. With that knowledge, Radke chose to go to the Buesgens' house armed with a loaded rifle with a chambered bullet. He went to Buesgens' house on a four-wheeler instead of driving his truck and hid the four-wheeler in the woods so it would not be seen by Buesgens. Radke then hid at the bottom of a hill with his rifle close at hand and allowed his rifle to discharge, firing a shot in the direction of Buesgens, his house, and his family. Following that shot, Radke did not attempt to withdraw or otherwise defuse the situation. Nor did he distance himself from his rifle. Instead, Radke picked up the rifle, chambered a new round and, when Buesgens appeared with a shotgun at the top of the hill, pointed the rifle toward Buesgens and shot. Radke then proceeded to look through the rifle's scope and shoot Buesgens a second time. Given these facts and our conclusion that Buesgens was not the aggressor and did not otherwise provoke the shooting, we conclude that there is not a reasonable possibility that, but for counsel's alleged errors, the outcome of the proceeding would have been different.

We conclude that Radke's self-defense claim fails. Because the record supports the conclusion that the State disproved this first element of Radke's self-defense claim, we conclude that the evidence Radke now claims that his trial counsel failed to offer with respect to his fear, the reasonableness of his fear of Buesgens, and the reasonableness of his actions in response to that fear, would not have changed the outcome of Radke's trial.[4] No matter how probative and persuasive the evidence in question might be with respect to Radke's fear, its reasonableness, and the reasonableness of his actions, Radke's claim of self-defense would still fail and therefore the result of Radke's trial would

---

4. Given Radke's testimony, we fail to see how the admission of evidence of Buesgens' reputation for violence and past acts of domestic abuse/violence would support the conclusion that Radke was not the aggressor and did not provoke the circumstances leading to Buesgens being shot. The inferences to be drawn from that evidence as it relates to Radke's aggression and provocation support the opposite conclusion; that is, that Radke, knowing that history, consciously chose to sneak up on the Buesgens' home, hide in the woods with a loaded high-powered rifle, and shoot Buesgens.

not have been different had the evidence been introduced. Because Radke cannot show that the outcome of his trial would have been different if the evidence in question had been admitted, his ineffective-assistance-of-trial-counsel claim fails the prejudice prong of the *Strickland* test. Accordingly, we hold that the postconviction court did not err when it denied Radke's claim of ineffective assistance of trial counsel.

### III.

■ Radke's other postconviction claim was that the State violated its discovery obligations by withholding two police reports related to Buesgens' past acts of violence. The first report described a 1993 incident in which Buesgens' wife reported a domestic incident involving weapons. The second report summarized a 1994 incident in which Buesgens was "throwing furniture around" and threatened to take his wife hostage. As part of its disclosures to the defense, the State did provide a "master name report," which listed Buesgens' past contacts with the police and labeled the incidents in question with the descriptor "domestic." But the State did not turn over the case-specific reports or otherwise disclose the details underlying the 1993 and 1994 incidents.

■ Radke argues that the State's nondisclosure of the case-specific reports or specific details of the two incidents violated the requirements of Minn. R.Crim. P. 9.01 and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Under Rule 9.01 and *Brady,* the State is required to disclose evidence beneficial to the accused. *See* Minn. R.Crim. P. 9.01, subd. 1(6) (requiring prosecutor to disclose material or information that "tends to negate or reduce the defendant's guilt"); *Brady,* 373 U.S. at 87, 83 S.Ct. 1194 (requiring disclosure of evidence "favorable to

an accused"). But a defendant's conviction generally will not be reversed under *Brady* or Rule 9.01 unless the defendant also shows that the State's violation prejudiced his defense. *See State v. Jackson,* 770 N.W.2d 470, 479 (Minn.2009) (noting the general requirement of showing prejudice under Rule 9.01); *Pederson v. State,* 692 N.W.2d 452, 459 (Minn.2005) (describing prejudice as one of the elements of a successful *Brady* claim). This, Radke has failed to do.

■ To establish prejudice under *Brady* or Rule 9.01, the defendant must show a reasonable probability that, had the evidence been disclosed, the outcome of the trial would have been different. *See Jackson,* 770 N.W.2d at 479; *Pederson,* 692 N.W.2d at 460. Radke has failed to establish prejudice for at least two reasons. First, Radke's claim fails for much the same reason as his claim of ineffective assistance of counsel: the State proved that Radke was the aggressor and provoked the circumstances leading to Buesgens being shot, which would be unaffected by the evidence that the State allegedly failed to disclose. Thus, the evidence, if disclosed, would have had no effect on the outcome of Radke's trial.

■ Second, Radke cannot demonstrate prejudice because the evidence in question was not admissible. *See State v. Hathaway,* 379 N.W.2d 498, 506 (Minn. 1985) (finding discovery violation harmless when the undisclosed evidence would have been inadmissible). "Evidence of prior acts of violence by the victim, in contrast to reputation evidence, is not admissible to show the victim was the aggressor...." *State v. Penkaty,* 708 N.W.2d 185, 202 (Minn.2006). Thus, the specific past acts of violence the State failed to disclose were not admissible to show Buesgens was the aggressor. While past acts of the victim may be admissible in a self-defense case to

show the defendant's reasonable fear of serious bodily harm, they are only admissible if the defendant *knew* of those past acts. *See Penkaty,* 708 N.W.2d at 202. In his affidavit, Radke states that he knew generally that the police had been called to the Buesgens' residence for past acts of domestic violence—a fact fully confirmed and disclosed by the master name report provided by the State. But Radke does not claim that he knew of the particular incidents in question, or that his fear of Buesgens was based on the details underlying those incidents. Accordingly, the undisclosed details of the 1993 and 1994 incidents would not have been admissible in support of Radke's defense.

Thus, disclosure of the 1993 and 1994 police reports would not have changed the outcome of this case. We therefore hold that Radke cannot demonstrate prejudice from the State's nondisclosure. As a result, the postconviction court did not err when it denied Radke's discovery claim.

## IV.

■ Radke's third claim—raised for the first time in this appeal—is that the trial court's instructions to the jury improperly shifted the burden of proving self-defense to Radke. We review unobjected-to jury instructions for plain error. *See State v. Laine,* 715 N.W.2d 425, 432 (Minn.2006). Under that standard, Radke must show that there was (1) error, (2) that is plain, and (3) that the error affected his substantial rights. *Id.* If these three prongs are met, we then determine whether we must address the error to ensure fairness and the integrity of the judicial proceedings. *Id.*

Here, we conclude that Radke has failed to show that any error occurred. The instruction given at trial, which followed the pattern jury instruction for self-defense, *see* 10 Minn. Dist. Judges Ass'n,

*Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 7.05 (Supp. 2011), read as follows:

No crime is committed when a person takes the life of another person, even intentionally, if the defendant's action was taken in resisting or preventing an offense the defendant reasonably believed exposed the defendant to death or great bodily harm. In order for a killing to be justified for this reason four conditions must have [sic] be met.... All four conditions must be met. The State has the burden of proving beyond a reasonable doubt that the defendant did not act in self defense.

Radke argues that, by telling the jury that "four conditions must be met," the instruction implicitly shifted the burden to Radke to prove that those conditions had been satisfied. We disagree.

■ Jury instructions must be read and interpreted as a whole. *State v. Matthews,* 779 N.W.2d 543, 549 (Minn.2010). Here, the last sentence of the instruction clearly stated that "[t]he *State* has the burden of proving beyond a reasonable doubt that the defendant did not act in self defense." (Emphasis added.) And no other portion of the court's instruction shifted or assigned to Radke the burden of proving his claim of self-defense. Thus, consistent with the other instructions given to the jury, and consistent with the law of self-defense, the ultimate burden of proof was placed squarely and solely upon the State. *See Penkaty,* 708 N.W.2d at 207 (noting that, although the defendant has the burden of going forward with evidence to support his claim of self-defense, the State alone bears the burden of proof on the issue); *State v. Columbus,* 258 N.W.2d 122, 123 (Minn.1977) (similar). We therefore conclude that the trial court's instruction, read as a whole, was correct and we hold that no error occurred.

## V.

Radke next claims that the district court erroneously denied his request for an instruction on heat-of-passion manslaughter. According to Radke, the instruction should have been given because a reasonable jury could have concluded that Radke's fear upon seeing Buesgens panning a shotgun toward him clouded his reason and provoked him to shoot. We review the trial court's denial of the instruction for an abuse of discretion. *State v. Dahlin*, 695 N.W.2d 588, 597 (Minn. 2005). When evidence exists to support an instruction, a trial court abuses its discretion in not giving the instruction. *See id.* at 598. In deciding whether an instruction is warranted, we, like the trial court, must view the evidence in the light most favorable to the defendant. *See id.*

To be entitled to an instruction on heat-of-passion manslaughter, the defendant must show that there is a rational basis for the jury to conclude that both elements of heat-of-passion manslaughter were present: (1) that the killing was done in the heat of passion; and (2) that the passion was provoked by words or acts that would provoke a person of ordinary self-control under the circumstances. *State v. Johnson*, 719 N.W.2d 619, 626–27 (Minn.2006). The first element requires the defendant to have acted in the actual, subjective heat of passion. *State v. Carney*, 649 N.W.2d 455, 461 (Minn.2002). That is, the defendant must demonstrate that, in committing the crime, his "reason [was] clouded and his willpower weakened." *State v. Hannon*, 703 N.W.2d 498, 510 (Minn.2005). The defendant's behavior before, during, and after the crime is relevant in determining whether the defendant's reason was clouded and his willpower weakened. *Carney*, 649 N.W.2d at 461.

Here, Radke's testimony shows that, despite his own misgivings, he made a rational decision to go to the Buesgens' house. Radke drove there on his ATV and hid the ATV in the woods out of sight to avoid detection. Radke then loaded his rifle and approached the Buesgens' house through the wood line. When Radke heard Buesgens returning home in his truck, Radke hid at the bottom of a hill, but did not leave. Radke testified that he wanted to run and escape, but that he did not do so because he could not see whether Buesgens was armed. And although Radke said that he "panicked" and was scared, at some point he must have thought to release the safety and chamber a bullet into his rifle because, while he was hiding at the bottom of the hill, his rifle discharged. And after the gun discharged, Radke chambered another round.

Throughout the encounter that followed, Radke continued to evaluate and think through each of his actions. When Radke saw Buesgens appear at the top of the hill with a shotgun, Radke testified that he again calculated his chances to escape, taking into consideration the lack of surrounding cover. Radke also described his act of pulling the trigger as a thought-out choice: "I thought either I pull the trigger or I die, so I did." According to Radke, after chambering another round, he attempted to reason with Buesgens, telling Buesgens "it don't have to be this way," before looking through the scope of his rifle and shooting Buesgens a second time. He then went up to the house and told M.B. not to talk to anyone.

Considering this evidence, and accepting Radke's version of events as true, we conclude that there was no rational basis upon which a jury could have found that Radke acted in the subjective heat of passion. Radke's testimony about his actions before, during, and after the shooting, show that Radke was consciously thinking about the consequences of his actions and poten-

tial alternatives. Radke's testimony does not evince the "loss of self-control" normally associated with heat of passion. *State v. Stewart,* 624 N.W.2d 585, 591 (Minn.2001). Rather, Radke's testimony demonstrates a "rational, calculating and controlled ... state of mind" that is inconsistent with a finding of heat-of-passion manslaughter. *Id.* Thus, because no jury could reasonably find that Radke acted in the subjective heat of passion when he shot Buesgens, we hold that the trial court did not err in denying Radke's request for a heat-of-passion manslaughter instruction in this case.

## VI.

 Radke next claims that the State committed misconduct when it used a suppressed statement to law enforcement, admitted solely for impeachment purposes, as substantive evidence of guilt. In addition to Radke's first statement, which he made at the scene, and which was recorded and played for the jury at trial, Radke made a second statement while being held at the law enforcement center. Before trial, the district court suppressed this second statement, finding that it was obtained in violation of the rules set forth in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). At trial, the State was allowed to use this statement for impeachment during its cross-examination of Radke. Radke contends the State went further, and improperly used the suppressed statement as substantive evidence of guilt during its closing argument.

 Because Radke failed to object to the State's actions below, we review his claim for plain error. *See State v. Vue,* 797 N.W.2d 5, 13 (Minn.2011). Under the modified plain-error test applicable to claims of prosecutorial misconduct, Radke must first demonstrate that there was an

error, and that the error was plain. *See id.* The burden then shifts to the State to show that the error did not prejudice the defendant's substantial rights. *Id.; State v. Ramey,* 721 N.W.2d 294, 302 (Minn. 2006). Finally, if the State fails to meet that burden, we must decide whether the error seriously affected the fairness and integrity of the judicial proceedings. *Vue,* 797 N.W.2d at 13.

Here, we agree with Radke that, in at least some portions of its closing argument, the State went beyond the purpose of impeachment and invited the jury to use Radke's suppressed statement as substantive evidence of guilt. We conclude, however, that the State has met its burden of showing that the error did not affect Radke's substantial rights. As we have discussed, the State clearly met its burden of disproving Radke's claim of self-defense, and in light of the other evidence in this case, we see no reasonable likelihood that the State's misconduct had a significant effect on the jury's verdict. The State's use of Radke's suppressed statement constituted only a small portion of a lengthy and wide-ranging closing argument. The State also spent significant time discussing M.B.'s testimony and arguing that Radke's version of events was inconsistent with the physical and medical evidence. Further, any incriminating statements Radke made in the suppressed statement paled in comparison to the incriminating statements he made while being detained at the scene of the shooting. The State's use of this second statement during closing argument also pales in comparison to the way the State used the first statement. The State described this first statement by Radke as his "confession" and discussed significant portions of that statement, including Radke's admissions that he "murdered a man today in cold blood," and that he "came over here and planned it and murdered

[Buesgens]." The State also played the audio of that final excerpt twice during its closing argument and described it as a "text book definition of murder in the first degree."

Considering the evidence and the State's argument as a whole, we conclude that there is no reasonable likelihood that the State's improper use of the suppressed statement "had a significant effect on the jury's verdict." [5] *Montanaro v. State,* 802 N.W.2d 726, 732 (Minn.2011) (citations omitted) (internal quotation marks omitted). We therefore hold that the State has satisfied its burden of showing that the error did not affect Radke's substantial rights.

## VII.

■■■■ Radke raises two additional claims of prosecutorial misconduct. First, Radke argues that the State misstated the law with respect to the revival of an aggressor's right to self-defense during its closing argument. Second, Radke contends that the State also improperly inflamed the passions and prejudices of the jurors by calling Radke an "enraged predator" and comparing him to Rambo. Because Radke failed to object to these statements below, we review them for plain error. *See Vue,* 797 N.W.2d at 13. Here, we conclude that neither of Radke's claims satisfies that standard.

With respect to Radke's argument that the State misstated the law on an aggressor's right to claim self-defense, we conclude that any misconduct did not affect his substantial rights because, as discussed above, the State proved beyond a reason-

able doubt that Radke was the aggressor and provoked the events leading to Buesgens' death. Therefore, Radke is not entitled to any relief based on this argument.

Radke's claim that the State improperly inflamed the passions of the jury also fails. While colorful, we view the State's language as a reasonable and descriptive way to convey the State's version of what happened in this case, and it was not outside the bounds of what is permissible. *See State v. Williams,* 586 N.W.2d 123, 127 (Minn.1998) (noting that "the prosecutor has considerable latitude and is not required to make a colorless argument"). We therefore reject Radke's claim that the State's argument constituted misconduct.

## VIII.

■■■ Finally, Radke argues that even if none of his individual claims require reversal, the cumulative effect of the errors do. An appellant will be entitled to a new trial if the errors, considered cumulatively, had the effect of denying him a fair trial. *See State v. Jackson,* 714 N.W.2d 681, 698 (Minn.2006). Here, having carefully reviewed the record, we are satisfied that Radke's trial was not unfair. Accordingly, we affirm Radke's conviction and the district court's denial of postconviction relief.

Affirmed.

■■■■■■

---

5. We reach this conclusion despite our recognition that the trial court's instructions erroneously *suggested* that *substantive* consideration of the suppressed statement by the jury was proper. In short, even *assuming* that the jury considered the statement to be substantive evidence, we believe the importance of the statement was limited in comparison to the State's other evidence and arguments, and that it simply is not likely to have had a significant impact on the jury's verdict.