**STATE of Minnesota, Respondent,**

**v.**

**Jeffery Lamar YOUNG, Appellant.**

**No. A04–0613.**

Supreme Court of Minnesota.

March 2, 2006.

· Bradford William Colbert, St. Paul, for appellant.

Mike Hatch, Atty. Gen., St. Paul, Robert M.A. Johnson, Anoka County Atty., Robert D. Goodell, Asst. County Atty., Anoka, for respondent.

## OPINION

ANDERSON, G. BARRY, Justice.

Jeffery Lamar Young appeals from his convictions of first-degree felony murder, second-degree intentional murder, second-degree assault, and kidnapping. Young requests a reversal of his murder convictions based on insufficient evidence. In the alternative, alleging error on several grounds, Young seeks a new trial. Because sufficient evidence sustains the murder convictions and there is no error warranting a new trial, we affirm.

This direct appeal arises out of the murder of Curtis Anthony, the assault and kidnapping of Precious Franklin, and the assault and kidnapping of R.E., Franklin's son. Anthony was attacked and shot at Franklin's apartment in the early morning hours of November 3, 2002. He later died as a result of the gunshot wound. Lennell Martin was also convicted of Anthony's murder. *See State v. Martin,* 695 N.W.2d 578, 582 (Minn.2005).

Anthony, at the time of his death, had been living with Franklin and her son, R.E., for about two months. Anthony had previously been involved in a relationship with Monique Frye and they had a daughter together. Frye is a cousin of Martin and Young. Frye had previously called Martin and Young when she had problems with Anthony "so they could talk to [Anthony] and calm him down." Frye eventually applied for a restraining order against Anthony. She testified that she applied for the order because Anthony threatened to shoot her and her boyfriend. Frye also testified that Young had encouraged her to use the court system to resolve her issues with Anthony and that Young had once calmed Anthony when Anthony began to get belligerent with the police. The day before Anthony's death, Anthony went to his daughter's dance studio, an area included in the order.

On the morning of November 3, 2002, at approximately 4:00 a.m., Franklin awoke and went to check on R.E. She noticed that her kitchen light was on and when she entered her kitchen she was confronted by a man holding a gun and a man holding a knife. Franklin testified that she did not know the men. She screamed and ran into the bedroom, waking Anthony. The two men followed Franklin into the bedroom, pointing the gun at both Anthony and Franklin. R.E. entered the bedroom and joined Franklin and Anthony on the bed. Franklin and Anthony pleaded with the men for R.E.'s safety. The man with the gun took Franklin's arm and placed her and R.E. in the bathroom. While in the bathroom, Franklin heard the men "interrogating" Anthony and she heard Anthony say "I don't know where" and "cousin." She also heard Anthony "making noises like he was hurt."

During this time, Franklin's upstairs neighbor had heard Franklin's scream and had walked outside the building to investigate. He saw a greenish-colored Cadillac parked near the apartment building. He came back inside and knocked at Franklin's door. While at the door, the neighbor heard a man say, "That's my money." Franklin heard a knock on her door, followed by a gunshot and noises as if people were running out of the apartment. The neighbor also heard the gunshot and ran upstairs to his apartment to call the police. Franklin emerged from the bathroom and saw Anthony bent over, bleeding heavily and having difficulty breathing. Franklin

testified that Anthony told her, "Call the police. Jeff and Lenair" or "Call the police. It's Jeff and Lennell." By the time the police arrived Anthony was unable to say anything more than that he could not breathe. He stopped breathing within minutes of the arrival of the police.

The police officer who spoke with Franklin at the scene testified that Franklin told him that there were two perpetrators and that one perpetrator's name was "Lenny" or "Lennell." Franklin was later interviewed by a detective who testified that Franklin stated that Anthony had told her to call the police and tell the police "Jeff and Lenair or Lennell." Franklin later approached the detective and told him she had spoken with Anthony's sister and that "Jeff and Lennell" were cousins of Anthony's former girlfriend. Police spoke with Frye, who gave them the full names of Young and Martin. Later that day, Franklin identified Martin out of a photographic lineup as the perpetrator who had carried the gun. After she made that identification, she pointed to another picture on the lineup and indicated that she thought that was the other suspect "but I told them that I wasn't absolutely positive but some of the traits were similar." Franklin testified that at that point the police told her "No. No. The second suspect isn't on this one." The next day, Franklin identified Young out of a separate photographic lineup.

The day after Anthony was shot, Young and Martin voluntarily went to talk to the police. In his statement to police, Young said he did not know where Anthony lived and that he was at his sister's home at the time Anthony was killed. Blood found in Martin's vehicle, a blue-green Cadillac, matched Anthony's DNA profile. Other blood found in the vehicle contained a mixture of DNA profiles. The predominant profile in the mixture matched Anthony's profile, and Young and Martin could not be excluded as contributors to the mixture. Young's fingerprint was found on the driver's window in Martin's car. In addition, a handwritten note containing directions to Franklin's apartment was found in Young's vehicle. A handwriting expert testified that there were indications that Young had written the note but was unable to make a positive identification of the author. At trial, Young presented expert testimony that no blood had been found in his car or on his or Martin's clothing. In addition he presented the testimony of three character witnesses.

Young was convicted of first-degree felony murder, second-degree intentional murder, two counts of second-degree assault and two counts of kidnapping. He was acquitted of first-degree premeditated murder. Young was sentenced to life imprisonment for the first-degree felony murder conviction. The district court imposed sentences of 36 months imprisonment for each of the assault convictions and sentences of 36 and 58 months for the kidnapping convictions. Each of these four sentences was imposed concurrently with Young's life sentence. Young directly appeals his convictions to this court.

Young raises the following six issues on appeal:

1. Was the evidence sufficient to support Young's convictions of first-degree felony murder and second-degree intentional murder?

2. Did the state commit misconduct in closing argument, and, if so, does such misconduct constitute reversible error?

3. Did the district court commit reversible error when it permitted the state to introduce Franklin's previous identification of Young?

4. Did the district court commit reversible error by denying Young's motion to remove a juror for cause?

5. Did the district court's admission of Anthony's hearsay statement constitute reversible error?

6. Did the district court commit reversible error by refusing the jury's request during deliberations for a transcript of Franklin's testimony?

## I.

Young was convicted of first-degree felony murder, Minn.Stat. § 609.185(a)(3) (2004); the underlying felony was burglary. Young was also convicted of second-degree intentional murder, Minn.Stat. § 609.19, subd. 1(1) (2004). Both of these crimes require an intentional killing. *See* Minn.Stat. §§ 609.185(a)(3), 609.19, subd. 1(1). Young argues that the evidence was insufficient to show that he committed Anthony's murder intentionally, and therefore he asks this court to reverse his convictions of first and second-degree murder. The state argues that there is sufficient evidence to show that Martin intentionally killed Anthony and that Young is liable as an accomplice under Minn.Stat. § 609.05 (2004).

When reviewing sufficiency of evidence, we inquire "whether, given the facts in the record and any legitimate inferences that can be drawn from those facts, a jury could reasonably find that the defendant was guilty of the charged offense." *State v. Pierson*, 530 N.W.2d 784, 787 (Minn.1995). We view the evidence in the light most favorable to the verdict. *State v. Moore*, 438 N.W.2d 101, 108 (Minn.1989).

To convict Young under Minn.Stat. § 609.185(a)(3) or Minn.Stat. § 609.19, subd. 1(1), the state must prove that Young, or someone for whose crimes Young is liable under Minn.Stat. § 609.05, caused the death of Anthony "with intent to effect the death of [Anthony] or another." Minn.Stat. §§ 609.185(a)(3), 609.19, subd. 1(1). In this case, the state did not seriously pursue the theory that Young actually shot Anthony, and instead argued, both to the jury and on appeal, that Young is liable for the crimes of Martin under section 609.05. Accordingly, the evidence is sufficient to support Young's convictions if there is: (1) sufficient evidence for a jury to reasonably find that Martin caused the death of Anthony with the intent to effect the death of Anthony, and (2) sufficient evidence for a jury to reasonably find Young liable for Martin's crimes under section 609.05.

*A. Whether sufficient evidence exists for the jury to reasonably find that Martin possessed the requisite intent to kill.*

Martin had the intent required by Minn.Stat. §§ 609.185(a)(3), 609.19, subd. 1(1), if he either had a purpose to kill Anthony or believed that his actions, if successful, would kill Anthony. *See* Minn. Stat. § 609.02, subd. 9(4) (2004). "Intent is an inference drawn by the jury from the totality of circumstances." *State v. Raymond*, 440 N.W.2d 425, 426 (Minn.1989). A conviction based on circumstantial evidence will stand only if the circumstantial evidence forms "a complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt." *State v. Leake*, 699 N.W.2d 312, 319–20 (Minn.2005) (citation omitted). A jury may infer a person's intent to kill from the nature of the killing. *State v. Darris*, 648 N.W.2d 232, 236 (Minn.2002).

Young argues that the evidence suggests that the shooting was more likely

an accident than an intentional killing. Viewing the evidence in a light most favorable to the verdict, however, the evidence is strong that the killing of Anthony was *not* accidental. As the state points out, Martin brought a loaded gun with him as he burglarized the apartment. Martin removed Franklin and R.E. from the bedroom where Anthony was, and then returned to the bedroom and shot Anthony. Moreover, the gunshot wound was not the only injury Anthony suffered. The medical examiner testified that Anthony suffered an approximately inch-deep, non-lethal stab wound to his neck, as well as defensive lacerations to his thumb. In addition, Anthony suffered a fractured larynx. The jury could reasonably infer that the gunshot that killed Anthony was not accidental, but instead the last act in a series of acts committed for the purpose of killing Anthony. This circumstantial evidence excludes, beyond a reasonable doubt, any reasonable inference other than that Martin had the intent to kill Anthony when he caused Anthony's death.

B. *Whether sufficient evidence exists for the jury to reasonably find that Young was liable for the crimes of Martin under section 609.05, subd. 1.*

■ Under Minn.Stat. § 609.05, subd. 1, Young is liable for Martin's murder of Anthony if Young intentionally aided, advised, hired, counseled, conspired with or otherwise procured Martin to kill Anthony. Jurors can infer the necessary intent from factors including: "defendant's presence at the scene of the crime, defendant's close association with the principal before and after the crime, defendant's lack of objec-

tion or surprise under the circumstances, and defendant's flight from the scene of the crime with the principal." *Pierson*, 530 N.W.2d at 788.

■ The record contains more than sufficient evidence to find that Young intentionally aided Martin in the murder of Anthony. Young and Martin burglarized the apartment together, and the jury could reasonably infer from Franklin's testimony that Young stood guard over Anthony while Martin removed Franklin and R.E. from the eventual murder scene. After Anthony was shot, Young fled the scene with Martin. In addition, there is evidence that Young personally possessed the intent to kill Anthony, because Franklin saw Young holding a knife and Anthony suffered a knife wound to his neck as well as defensive lacerations to his hands. We conclude that there is sufficient evidence to hold Young liable for Martin's intentional murder of Anthony under Minn.Stat. § 609.05, subd. 1, and consequently there is sufficient evidence to sustain Young's convictions of first-degree felony murder and second-degree intentional murder.[1]

## II.

Young argues that the prosecutor engaged in misconduct in closing argument, and that such misconduct warrants reversal of his convictions. Young alleges three types of misconduct occurred: (1) that the prosecutor engaged in "name-calling," (2) that the prosecutor improperly argued that the presumption of innocence no longer applied to Young, and (3) that the prosecutor presented the jury with a motive for the murder that was unsupported by the evidence.

---

1. At oral argument, Young also argued that, pursuant to Minn.Stat. § 611.02 (2004), if we had a "reasonable doubt" about the sufficiency of the evidence to support Young's convictions, we should reduce his felony murder conviction from first-degree to second-degree. We have found no authority supporting such use of the statute and decline to adopt Young's proposed application of Minn.Stat. § 611.02.

Young did not object to any of the alleged misconduct during trial. In the absence of objection at trial, we review the defendant's claim of prosecutorial misconduct to determine if plain error occurred. *State v. MacLennan*, 702 N.W.2d 219, 235 (Minn.2005). Plain error consists of (1) error, (2) that is plain, and (3) affects substantial rights. *Leake*, 699 N.W.2d at 327. If the error was prejudicial and affected the outcome of the case, the third prong of this test is met. *Id.* Plain error is considered prejudicial if "there is 'a reasonable likelihood' that the error 'had a significant effect' on the jury's verdict." *Id.* (quoting *State v. Griller*, 583 N.W.2d 736, 741 (Minn.1998)). If all three prongs of the plain error test are met, we then determine "whether we should address the error to ensure fairness and the integrity of the judicial proceedings." *Id.* When evaluating alleged misconduct, we look to the closing argument as a whole. *State v. Powers*, 654 N.W.2d 667, 679 (Minn.2003).

### A. The prosecutor's reference to Young and Martin as "cowards."

Young argues that the prosecutor's description of Young and Martin as "cowards" constituted misconduct. During closing argument, while describing the sequence of events surrounding the murder, the prosecutor said:

> Eventually, they shot [Anthony]. Right in the chest. And as he lay—or is standing there bleeding profusely, grasping at any straws left of life, the two cowards, Jeff and Lennell, ran out of the apartment, got into the green Cadillac, the getaway car, and left the scene, and left Curtis Anthony to die there.

Character attacks during closing arguments are improper, but "parties are permitted to argue reasonable inferences from the facts presented at trial." *Leake*, 699

N.W.2d at 328. The state concedes that in the usual case reference to a defendant as a "coward" would likely constitute misconduct, but argues, based on Young's introduction of evidence of his good character, that the statement was not improper. But, even if the reference to Young as a "coward" constituted prosecutorial misconduct, this isolated statement does not constitute prejudicial error. The reference to Young as a "coward" was not repeated, the jury acquitted Young of premeditated murder, and the jury was properly instructed that the arguments of attorneys were not evidence. *See State v. Washington*, 521 N.W.2d 35, 40 (Minn.1994). There is no reasonable likelihood that the prosecutor's isolated reference to Young as a "coward" had a significant effect on the jury's verdict, and therefore, even if this reference was error, it is not reversible error.

### B. Presumption of innocence.

Young next argues that the following portion of the prosecutor's final argument was improper:

> When the trial began, the Court told you that that young man right there is an innocent man. He was. Until the defense stood up and rested. Because at that time the state had presented to you sufficient evidence to find the defendant guilty of all the crimes that the Court just gave you the—instructions on. He's no long [sic] an innocent man. The evidence that's been presented to you by the state has shown you that he's guilty beyond a reasonable doubt. Let me tell you why[.]

Young claims that this statement amounted to a claim that Young was not entitled to the presumption of innocence when the jurors began their deliberation. Read in context, however, the prosecutor's argument appears to be that the state had produced sufficient evidence of Young's

guilt to overcome the presumption of innocence, not that he was not entitled to the presumption in the absence of proof beyond a reasonable doubt. The language used by the prosecutor is analogous to the language used to describe the presumption of innocence in CRIMJIG 3.02. *See* 10 Minn. Dist. Judges. Ass'n,. *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 3.02 (4th ed. 1999) ("The defendant is presumed innocent of the charge made. .This presumption remains with the defendant *unless and until the defendant has been proven guilty beyond a reasonable doubt.*") (emphasis added). We have previously recommended that, when explaining the presumption of innocence, counsel would be wise to " 'adopt some definition which has already received the general approval of the authorities, especially those in our own state.' ". *State v. Bohlsen,* 526 N.W.2d 49, 50 (Minn.1994) (quoting *State v. Sauer,* 38 Minn. 438, 439, 38 N.W. 355, 356 (1888)). The argument of the prosecutor was not a misstatement of the law, and did not constitute error.

*C. Speculation regarding motive.*

 The state's closing argument is not required to be "colorless, [but] it must be based on the evidence produced at trial, or the reasonable inferences from that evidence." *State v. Porter,* 526 N.W.2d 359, 363 (Minn.1995). Young alleges that the prosecutor committed misconduct in closing argument by misstating the evidence and speculating about the motive for the murder. The prosecutor stated:

Why would somebody do this to [Anthony]? Nobody knew. Nobody could give a reason why Curtis Anthony was killed. Did anybody have a reason? You've got enough facts before you to form a few reasons. Was Monique Frye pregnant with Curtis's baby? She told [you that] she last slept with Curtis in October. Did she find out she was preg-

nant? And Curtis snuffed her and went back to Precious? So Monique cried to Jeffery and Lennell, "You've got to help me. Curtis won't take care of this baby. He's dumping me." And Jeff and Lennell, as they've done in the past, go to Monique's rescue? Is that the motive? Sounds pretty harsh.

\* \* . \* \*

The only people that really know are those people that were in the room that night. Jeff, Lennell and Curtis. Curtis can't tell us why.

Frye testified that her sexual relationship with Anthony ended in *August* of 2002, not October of 2002. While misstating a date is not ordinarily a basis for a claim of prosecutorial misconduct, absent the incorrect date, the prosecutor's argument becomes implausible. Since the child with whom Frye was pregnant at the time of Anthony's murder was born in July of 2003, it is not reasonable to infer that Anthony was the father of the child or that Frye thought Anthony was the child's father. This portion of the prosecutor's closing argument was error, and, in light of *Porter,* the error was plain.

 While this portion of the argument constituted plain error, there is no reasonable likelihood that the error had a significant effect on the jury's verdict. The impact of improper speculation was lessened because the prosecutor emphasized that no one knew the actual motive. In light of this qualification of the improper statements, the jury's acquittal of Young of premeditated murder, and the fact that the jury was instructed that the arguments of the attorneys were not evidence, the error was not prejudicial.

III.

At trial Franklin identified Young and also testified that she had identified Young

through a pretrial photographic lineup. On appeal Young challenges the admission of this evidence, arguing that Franklin assumed that a suspect was in the photographic lineup. Based on this assumption, Young argues that the district court's admission of Franklin's pretrial identification of Young violated Young's right to due process because the lineup was unnecessarily suggestive and created a very substantial likelihood of misidentification.

A two-part test is used to determine whether pretrial eyewitness identification testimony must be suppressed. *State v. Ostrem*, 535 N.W.2d 916, 921 (Minn.1995). The first determination is whether the pretrial identification procedure was unnecessarily suggestive. *Id.* If the procedure is found to be unnecessarily suggestive, the identification evidence may still be admissible as long as "the totality of the circumstances establishes that the evidence was reliable." *Id.*

When determining whether an identification procedure was unnecessarily suggestive, we inquire "whether the procedure used by the police influenced the witness identification of the defendant." *State v. Taylor*, 594 N.W.2d 158, 161 (Minn.1999). The key factor in considering whether an identification procedure was unnecessarily suggestive is whether the defendant was unfairly singled out for identification. *Ostrem*, 535 N.W.2d at 921.

Young argues that the procedures used by police were unnecessarily suggestive because they led Franklin to believe that a suspect was in the second lineup. Although it is possible that Franklin assumed a suspect was in the lineup when she made her identification of Young, it is far from clear that this was her assumption and even less clear that police led her to that assumption. She testified that the police brought the lineup so she could, "identify the second suspect," and to "verify the second suspect that came into my home," but she also testified that the police read her the standard advisory—stating that the suspect *may or may not* be in the lineup—before she made her identification. In addition, Young has not argued that the lineup "singled him out" in any way, and Franklin testified that the police did not give any indications regarding which photograph she should choose. We hold that the photographic lineup was not unnecessarily suggestive and did not violate Young's right to due process.

### IV.

Both the United States and Minnesota Constitutions guarantee criminal defendants the right to an impartial jury. U.S. Const. amends. VI, XIV; Minn. Const. art. 1, § 6; *State v. Greer*, 635 N.W.2d 82, 87 (Minn.2001). The exclusive grounds on which a juror may be challenged for cause are found in Minn. R.Crim. P. 26.02, subd. 5(1). *State v. Roan*, 532 N.W.2d 563, 568 (Minn.1995). When reviewing the district court's decision to remove a juror for cause, we give "deference to the trial judge because the trial judge is in the best position to observe prospective jurors." *Id.*

Young argues that he was denied his constitutional right to an impartial jury because the district court refused to remove a juror whom Young challenged for cause. Young's challenge is based on statements made by the juror in his questionnaire and in voir dire concerning the role of religion in the juror's decision-making process. On his juror questionnaire, in response to the question "[w]hy do you feel you would be a good juror in this case?" the challenged juror wrote "[b]ecause I am a Christian who can ask for divine wisdom." During voir dire, the following ex-

change occurred between the prosecutor and the juror:

Q: One thing that you said—and I just want you to explain it a little bit to me. Okay?

A: Uh-huh.

Q: Is that you felt that because you're a Christian you could ask for divine wisdom.

A: Yes.

Q: So you would pray about making the right decision?

A: Yeah. You—you can—you—you can go with your mind and with your heart—

Q. Okay.

A:—And stuff.

Q: Okay. And you'd be able to incorporate all that—all the evidence that you hear into that. Right?

A: Yeah. I mean . . . .

Q: And put it altogether [sic] to make your decision?

A: Yeah. That's . . . .

Q: Okay. How many hours a week do you work?

After the district court denied Young's challenge for cause, Young decided not to use a peremptory challenge.

■ It is unclear on which ground of Minn. R.Crim. P. 26.02, subd. 5(1), Young is challenging the juror's fitness to serve. Before the district court, Young stated that the juror's "religious beliefs would substantially prejudice the rights of Mr. Young." On appeal, Young references Minn. R.Crim. P. 26.02, subd. 5(1)(1), which relates to juror bias,[2] but Young does not argue that this juror's religious beliefs biased the juror against Young.

Instead Young appears to argue that the juror's statement that he could "ask for divine wisdom," or pray, when making his decision showed that the juror would not base his decision on the evidence and jury instructions. But Young offers no support establishing that the juror's reliance on prayer was in place of an evaluation of the evidence presented or a refusal to follow the law as instructed. Nor does Young produce authority for his argument that a district court's refusal to remove a juror who relies, in part, on prayer to make his or her final decision is an abuse of discretion. Young's argument for disqualification of a juror who relies on prayer is without merit. We hold that the district court did not abuse its discretion in denying Young's motion to remove the juror for cause.

V.

■ In his pro se supplemental brief, Young argues that the admission of Anthony's hearsay statement, "Call the police. Jeff and Lenair," constitutes reversible error. Young argues that this statement was not admissible as a dying declaration or an excited utterance, and that its admission violated Young's Sixth Amendment right to confrontation under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Young concedes that he did not object at trial to the admission of this hearsay statement. In the appeal of Young's codefendant, Lennell Martin, we held that the district court did not abuse its discretion in admitting Anthony's statement under the dying declaration exception to the hearsay rule. *Martin*, 695 N.W.2d at 584. We also held that "the admission into evidence of a dying

---

**2.** A juror may be challenged for cause on the ground of "[t]he existence of a state of mind on the part of the juror, in reference to the case or to either party, which satisfies the court that the juror cannot try the case impartially and without prejudice to the substantial rights of the party challenging." Minn. R.Crim. P. 26.02, subd. 5(1)(1):

declaration does not violate a defendant's Sixth Amendment right to confrontation within the meaning of *Crawford* because an exception for dying declarations existed at common law and was not repudiated by the Sixth Amendment." *Id.* at 585–86. After reviewing the evidence in this case, we hold that the evidence in the two cases relating to this issue does not differ in any material respect. The district court did not abuse its discretion in admitting Anthony's hearsay statement as a dying declaration.

## VI.

While in deliberations, the jurors requested "a copy or recording" of Franklin's testimony. The district court denied this request. In his pro se supplemental brief, Young argues that the district court committed reversible error by denying the jury's request to review Franklin's testimony. Young concedes that he personally waived his right to be present in the event the jury returned with a request to see a transcript of testimony or to have testimony read to them. Young's counsel indicated in advance that she agreed with the district court's "standard answer" of denial of such requests by the jury, and she failed to object when the district court, after answering the jury's question, described the response given. A defendant may waive review of the district court's determination regarding the review of testimony by failing to object before the district court. *State v. Smith,* 582 N.W.2d 894, 896 (Minn.1998). We may still review the district court's decision for plain error. *Griller,* 583 N.W.2d at 740.

A district court has broad discretion when determining whether to allow jurors to review testimony during deliberations. *State v. Lane,* 582 N.W.2d 256, 259 (Minn.1998). Young argues, however, that the district court *failed* to exercise its dis-

cretion by imposing a "blanket rule" against allowing the jury to review testimony. He bases this claim on the district court's statement to Young and trial counsel that its "standard answer is, 'No. You have to take evidence altogether and you have to remember what it is you heard.'" The district court continued, "Presuming that you're in agreement with that response, what I want to know is does—is it necessary to pull us all back together into the courtroom simply to give them that response if they're asking for something that has to do with somebody's testimony?"

We have indicated that district courts cannot follow a "blanket rule" in denying such requests from the jury. *State v. Rean,* 421 N.W.2d 303, 306 (Minn.1988). But we have also held that, even if a district court makes its denial on the basis of a "blanket rule," such a denial does not constitute error if the district court could have denied the request in a proper exercise of discretion. *Id.*

Franklin's testimony concluded twelve days before the jury began deliberations and the state told the jury that Franklin's testimony was key to the case against Young. *See State v. Spaulding,* 296 N.W.2d 870, 878 (Minn.1980) (noting that effect of district court's blanket refusal to allow jury to review testimony "force[d] the jury to decide the case on the basis of sketchy memory of the evidence"). On the other hand, allowing the jury to review Franklin's testimony could have given the testimony undue prominence. *Lane,* 582 N.W.2d at 260 (upholding a district court's decision not to allow jury to review testimony, based, in part, on belief that the rereading of requested testimony would give it undue prominence). In addition, granting the jury's request would have involved gathering 152 pages of transcript. "This court has made it clear that, when

the jury requests review of numerous pages of transcript, the trial court may deny the request." *State v. Daniels,* 332 N.W.2d 172, 177 (Minn.1983). Based on these reasons, the district court could, in its discretion, deny the jury's request. Therefore, the district court did not err in denying the jury's request.

Affirmed.

GILDEA, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.