**STATE of Minnesota, Respondent,**

v.

**Pedro AYALA–LEYVA, Appellant.**

**No. A13–0401.**

Court of Appeals of Minnesota.

May 19, 2014.

Review Granted Aug. 5, 2014.

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Jean Burdorf, Assistant County Attorney, Minneapolis, MN, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Lydia Villalva Lijò, Assistant Public Defender, St. Paul, MN, for appellant.

Considered and decided by SCHELLHAS, Presiding Judge; CLEARY, Chief Judge; and KLAPHAKE, Judge.

## OPINION

KLAPHAKE, Judge.*

Appellant challenges his conviction of conspiracy to commit first-degree controlled substance crime (sale), while he or a co-conspirator possessed a firearm, and his 360–month sentence, which is an upward departure from the presumptive 86–month guidelines sentence. Because the district court did not commit plain error in its jury instructions on the unanimity requirement and because the prosecutor's misconduct was not so prejudicial as to require a new trial, we affirm appellant's conviction. But because the district court's decision to impose a sentence that represents greater than double the presumptive sentence was not supported by severe aggravating factors as found by the sentencing jury, we reverse appellant's sentence and remand for further proceedings.

## FACTS

From July 2011 through March 2012, the Federal Bureau of Investigation (FBI) Safe Streets Task Force conducted an investigation of a large and well-organized methamphetamine (meth) trafficking network. Agents used confidential informants and undercover officers to conduct controlled buys of meth, electronic data monitoring, and wiretaps. The informa-

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

tion collected led agents to believe that the network involved members of a Mexican drug cartel known as La Familia Michoacana (LFM) moving meth from California to the Twin Cities, where it was distributed to mid-level dealers in large quantities and then to smaller-scale dealers who ultimately sold it to end-users. Appellant was not arrested until near the end of the investigation, after police seized a vehicle connected to appellant and executed a search warrant at the residence where appellant lived.

*Events leading to appellant's arrest*

In its early stages, the investigation focused on Koua Yang. Yang, according to an informant's tip, was selling large amounts of meth in Brooklyn Park. Agents put Yang under surveillance and conducted at least four controlled buys of meth from Yang between December 2011 and February 2012.

Early in the investigation, agents learned that Yang had a partner named Jose Salgado. From a wiretap of one of Yang's cellphones, agents also learned that Yang and Salgado had two supply sources: "Short," who was later identified as Felix Lopez Martinez, and "Peli," later identified as appellant Pedro Ayala–Leyva. Agents also identified Daniel Samorano as a courier, and obtained a wiretap for a phone number associated with Samorano.

On January 20, 2012, acting on a tip, St. Paul police conducted a traffic stop of a vehicle as it left an apartment building on East Ivy Avenue. Passenger Obet Moreno Guerrero was searched, and police seized meth, about $2,500 in cash, a receipt for the purchase of acetone, and cell phones. The vehicle, which contained an empty, concealed compartment in the front passenger seat, was registered to Guerrero, but its previous owner was appellant's brother-in-law. A search of the Ivy Avenue apartment revealed a container holding about 10 ounces of meth soaking in acetone, $14,500 in cash, and identification for Guerrero.

On February 5, 2012, police observed Salgado in a BMW parked outside a store in Brooklyn Park. The BMW was approached by an Audi driven by appellant. Salgado and appellant talked, walked into the store, and remained inside for about two minutes before leaving in their respective cars. Police watched the store video and did not see the two men make any exchange, but Salgado later testified at trial that he gave appellant money that he owed him for a drug debt during that meeting.

On February 11, 2012, agents learned that Samorano was leaving Minnesota in a red Subaru Outback and began to track his phone by GPS. Samorano reached Los Angeles on February 12, and left on February 16. Based on the wiretapped calls from Samorano's phone, agents believed that he had picked up a shipment of meth in California for delivery in Minnesota.

On February 18, the Minnesota State Patrol stopped and cited Samorano outside Lakeville, Minnesota, for driving with a revoked license. When the Subaru was impounded and towed, Samorano was picked up by a minivan driven by Mario Castro with appellant as a passenger. The group unsuccessfully attempted to reclaim the impounded Subaru. During a later search of the Subaru, a concealed compartment was found in the backseat containing seven packages totaling almost 10 pounds of meth.

Based in part on that discovery, on February 20, police executed a search warrant at a residence on Xerxes Court North in Brooklyn Park. As police were preparing to execute the warrant, they stopped a minivan leaving the residence. Inside

were three men: appellant, Mario Castro, and Rene Tirado.

Samorano was inside the residence. During the search, police found identification linking a basement bedroom to Samorano, a basement sleeping area to Castro, and an upstairs bedroom to Tirado. In another upstairs bedroom, police found identification for appellant and a notebook inside a dresser drawer that contained names and numbers described by police as "drug notes." In the same drawer, police found six Wells Fargo Bank deposit receipts inside a pouch.

On the same date, police executed a search warrant of a nearly empty Cottage Grove residence occupied by Felix Lopez Martinez, Yang and Salgado's other supply source. There, police found another apparent drug notebook, a semi-automatic 9–mm handgun, and a "food saver" appliance used to package drugs. A white Toyota Avalon parked at the residence was registered to Samorano and had empty concealed seat compartments. A Nissan Frontier pickup found at the residence had two concealed compartments containing meth, a gun case and gun, and $18,500 in cash.

The total weight of the meth seized by police during this portion of the investigation was 7308.4 grams, or 16 pounds, 2 ounces, with a street value of between $208,000 and $468,000, depending on whether it was sold by the pound or ounce. Appellant and his co-conspirators were arrested and charged with conspiracy to commit first-degree controlled substance crime.

Appellant's case proceeded to a jury trial. In addition to other aspects of the conspiracy, evidence was presented regarding the high number of phone calls made between cell phones associated with appellant and cell phones associated with the co-conspirators. Photos were admitted showing various co-conspirators making cash deposits into appellant's Wells Fargo Bank accounts. An analysis of the notebook found in appellant's bedroom at the Xerxes Court residence suggested that the organization had generated approximately one-half million dollars in revenue in the four-month period preceding appellant's arrest.

*Trial testimony of six co-conspirators*

Yang testified that he obtained drugs from appellant without having to provide immediate payment, and that Guerrero would usually collect payments from Yang. Yang estimated that he sold between one and six pounds of meth per week.

Salgado testified that he connected Yang with his suppliers, one of whom was appellant. Salgado testified that appellant once gave him a pound of meth taken from his vehicle, and that Guerrero later collected payment for the meth. Salgado testified that he gave appellant money at a store on February 5, 2012, to pay a drug debt, and that later that day he received a half-pound of meth.

Guerrero testified that he was a courier for appellant. Guerrero claimed that appellant helped him find the Ivy Avenue apartment and paid the $650 monthly rent. Guerrero described a delivery he and Castro made in December 2011 to Yang and Salgado, and testified that the meth was supplied by appellant. Guerrero testified that when he was stopped by police on January 20, he was delivering meth for appellant. Guerrero also testified that the meth soaking in acetone found in the Ivy Avenue apartment was appellant's.

Castro testified that he delivered drugs with Guerrero. He stated that he worked for appellant, delivering drugs and collecting money that he gave to appellant or to Rene Tirado. Castro also testified that he and an unidentified person drove the red

Subaru from Minnesota to California in January 2012, and that he and Samorano drove the car back to Minnesota, with drugs concealed in the backseat. After returning from California, Castro lived at the residence on Xerxes Court.

Victor Hernandez Sanchez testified that when he came to Minnesota in the summer of 2011, he went to an apartment on Guider Avenue in Woodbury, where appellant and others, including Castro, Tirado, and a man named "Douglas" were present. Sanchez testified that the group distributed meth and that he wanted to participate. Appellant was one of the leaders. Sanchez testified that his job was to distribute meth.

Douglas Galteco testified that he met appellant in 2009 and began staying at a stash house off Maryland Avenue in St. Paul where meth and money were kept. Galteco testified that he traveled to California with appellant in the winter of 2009 and drove a car back to Minnesota carrying meth with appellant following in a car behind. Galteco said that he stopped working for appellant shortly thereafter because appellant did not pay him, but appellant lured him back and he became a heavy seller. Galteco stated that they stashed drugs in several locations, including apartments on Guider Drive in Woodbury and Ivy Avenue. Galteco also testified that for a time he lived on Guider Drive with appellant, Tirado, Sanchez, and Castro. Galteco explained appellant's method of keeping track of expenses and testified that it was appellant's handwriting in the notebook found in appellant's bedroom.

*Appellant's testimony*

Appellant testified at trial and denied any involvement with the cartel or with drug trafficking. He described working continuously for cash since arriving in the United States in 2008, but claimed he held no formal job because he is undocumented. Appellant testified that since 2010, he has been purchasing salvaged vehicles in Minnesota and reselling them in California. Appellant claimed that while staying at the Xerxes Court residence, he did not use drugs, hear discussions about drugs, observe drugs or paraphernalia, or see or possess a firearm. Appellant testified that he shared space in a bedroom with Castro and that items were already in the room when he moved in.

The jury found appellant guilty of conspiracy to commit first-degree controlled substance crime. The district court sentenced appellant to 360 months in prison, which represents the statutory maximum. This appeal followed.

## ISSUES

1. Is appellant entitled to a new trial because the jury was not instructed that it had to reach a unanimous verdict on which of 20 overt acts were committed in furtherance of the conspiracy?

2. Is appellant entitled to a new trial because the prosecutor committed prejudicial and reversible misconduct?

3. Must appellant's 360–month sentence be reversed because it was. not supported by severe aggravating factors found by a jury, as required by *Blakely*?

## ANALYSIS

### I.

Appellant argues that the district court erred by failing to instruct the jury that it was required to unanimously agree on the particular overt act or acts that were committed in furtherance of the conspiracy. The court listed 20 distinct acts for the jury to consider, but did not instruct the jurors that they must agree on which particular act or acts satisfied the

overt act element of the crime of conspiracy. The district court gave a general unanimity instruction, and instructed the jury that "each juror must agree with [the] verdict" and that "[y]our verdict must be unanimous."

The parties disagree on whether appellant objected to the instruction, and on whether a harmless or plain-error standard applies on review. Defense counsel merely stated that he "did not agree one way or the other with respect to that," when the district court stated on the record that the parties had agreed during an in-chambers discussion that the jury did not have to be instructed that it must unanimously agree on which overt act was committed. Defense counsel did not offer an alternative instruction, and merely left it "within the discretion of the Court" to decide whether the jury needed to agree on a single overt act to sustain the conspiracy.

Defense counsel's statements and acquiescence to the district court's authority to determine the proper instructions did not constitute an objection to the instructions for purposes of determining whether to apply a harmless error standard of review. *See State v. Cross,* 577 N.W.2d 721, 726 (Minn.1998) (providing that defendant's failure to propose specific jury instructions or to object to instructions before they are given generally constitutes a waiver of the right to challenge instructions on appeal); Minn. R.Crim. P. 26.03, subd. 19(4)(b), (d) (providing that party objecting to jury instructions must do so on record and must state specific grounds for objection). A plain-error standard of review therefore applies. *See State v. Hayes,* 831 N.W.2d 546, 555 (Minn.2013) (providing that unobjected-to jury instructions are reviewed for plain error).

### 1. *No error*

■■■ "Jury verdicts in all criminal cases must be unanimous." *State v. Pendleton,* 725 N.W.2d 717, 730 (Minn.2007) (citing Minn. R.Crim. P. 26.01, subd. 1(5)). A district court must avoid jury instructions that "are unclear and potentially raise doubt about the unanimity of the jury verdict." *State v. Stempf,* 627 N.W.2d 352, 355 (Minn.App.2001). If "jury instructions allow for possible significant disagreement among jurors [on which] acts the defendant committed, the instructions violate the defendant's right to a unanimous verdict." *Id.* at 354.

Appellant argues that the 20 overt acts alleged to have been committed in furtherance of the conspiracy in this case were themselves elements of the conspiracy offense, and not alternative acts or means of establishing the overt-acts element of the offense. Appellant cites multiple unpublished opinions from this court that rely on this court's decision in *Stempf.*

In *Stempf,* the defendant was charged with one count of possession of meth, based on two distinct acts that occurred at separate times and locations. 627 N.W.2d at 354. The defendant had separate defenses for each act, and this court held that it was error for the state to refuse to "elect which act of possession it was relying on for the conviction," when the act of possession is an element of the crime. *Id.* at 357–58. Thus, the jury instructions violated the defendant's right to a unanimous verdict because the instructions allowed "for possible significant disagreement among jurors as to what acts the defendant committed," when each single act was an element of the crime. *Id.* at 354.

■■■ But *Stempf* does not prohibit the use of alternative acts or means to prove the existence of one or more overt acts taken in furtherance of a conspiracy. The supreme court has distinguished between

unanimity on the elements of a crime and unanimity as to the facts underlying each element of a crime. *Pendleton,* 725 N.W.2d at 731. A jury must unanimously agree that the state has proved each element of an offense. *Id.* But the jury is not "always required to agree on alternative ways in which a crime can be committed." *Id.* at 732. Thus, the jury was required to unanimously agree that Pendleton, who was convicted of felony murder while committing kidnapping, had kidnapped the victim, defined as confining or removing the victim from one place to another without the victim's consent, when done to accomplish one of three purposes. *Id.* at 729–30. But the jury could reach different conclusions as to whether the purpose of the kidnapping was to commit great bodily harm, to commit murder, or to facilitate flight. *Id.* Each of these purposes constituted an alternative mode of commission of the crime of kidnapping. *Id.* at 732–33. *See also Hayes,* 831 N.W.2d at 556 (stating that jury is not required to unanimously agree on which specific acts of domestic abuse constitute a past pattern of domestic abuse).

This court recently concluded that jury unanimity was required in a case of third-degree criminal sexual conduct based on sexual conduct during a single encounter at which the victim was seeking spiritual aid. *State v. Wenthe,* 845 N.W.2d 222, 230 (Minn.App.2014). This court reasoned that the offense required proof of sexual conduct during a single meeting at which spiritual aid was sought, that the evidence presented at trial included at least three possible meetings in which the adult victim and the defendant engaged in sexual conduct, and that credible evidence had been offered to dispute the claim that spiritual comfort was always the purpose of the meetings. *Id.* at 229–230. Under these facts, as in *Stempf,* jury unanimity was

required because these were elements of the offense. *Id.*

This case, however, is more in line with *State v. Crowsbreast,* 629 N.W.2d 433, 437 (Minn.2001). In *Crowsbreast,* the defendant was convicted of first-degree domestic abuse homicide. The supreme court held that the jurors were not required to unanimously agree which of several possible acts satisfied the "past pattern of domestic abuse" element, and that it was sufficient if they agreed on the "bottom line" which was whether the defendant had engaged in a past pattern of domestic abuse. *Id.* at 439.

Cases from other jurisdictions involving conspiracies similar to the one involved here have held that a jury need not unanimously agree on which of many overt acts has been committed in furtherance of a conspiracy, because the element consists of "*an* overt act, not a *specific* overt act" committed in furtherance of the conspiracy. *People v. Russo,* 25 Cal.4th 1124, 108 Cal.Rptr.2d 436, 25 P.3d 641, 647 (2001) (emphasis in the original). This means that a jury need not unanimously decide "which of several possible sets of underlying brute facts make up a particular element," or "which of several possible means the defendant used to commit an element of the crime." *Richardson v. United States,* 526 U.S. 813, 817, 119 S.Ct. 1707, 1710, 143 L.Ed.2d 985 (1999); *see United States v. Kozeny,* 667 F.3d 122, 132 (2nd Cir.2011) (concluding that which overt act among multiple such acts has been committed is brute fact and not element of crime).

In this case, the state presented evidence of a single ongoing conspiracy between appellant and multiple co-conspirators to distribute meth. The state also presented evidence of at least 20 overt acts that it alleged were committed in furtherance of the conspiracy by appellant or his

co-conspirators. Because each overt act provided alternative means to prove the element in furtherance of the crime of conspiracy, and thus constituted a "brute fact" to support an element of the offense, we conclude that the district court did not err in its jury instructions.

### 2. No plain error

■ Even if we were to conclude that the district court erred in its instructions, we cannot conclude that error was plain. *See Hayes,* 831 N.W.2d at 555 (providing that error is plain if it "contravenes case law, a rule, or a standard of conduct"). The district court and the parties in this case agreed that there are "contrary positions" on the issue. And defense counsel specifically left it to the court's discretion to decide what form the jury instructions should take. With defense counsel's implicit permission, the court concluded that not requiring jury unanimity on a single overt act made "a lot more sense to me than any contrary positions." Given the "cloudy" or "unsettled" state of the law, as recognized even in the unpublished cases cited by appellant, the district court's decision regarding the wording of the jury instruction was not plain error.

### 3. Substantial rights not affected

■ Even if this court were to conclude that the jury instructions constituted plain error, appellant's substantial rights were not affected. An error affects substantial rights if it is "prejudicial and affected the outcome of the case." *State v. Griller,* 583 N.W.2d 736, 741 (Minn.1998). "An error in instructing the jury is prejudicial if there is a reasonable likelihood that giving the instruction in question had a significant effect on the jury's verdict." *State v. Watkins,* 840 N.W.2d 21, 28 (Minn. 2013) (quotation omitted). "The court's analysis under [this] third prong of the

plain error test is the equivalent of a harmless error analysis." *State v. Matthews,* 800 N.W.2d 629, 634 (Minn.2011).

The evidence of appellant's guilt was overwhelming, and the overt-act element was not genuinely disputed by appellant. In particular, appellant did not challenge the existence of an agreement between a number of conspirators to distribute and sell meth. Rather, he denied any involvement in the conspiracy and claimed that he was not part of the agreement to distribute and sell meth. But it is clear that the jury rejected appellant's defense as unbelievable, given the testimony of six co-conspirators, who consistently and independently testified that appellant was a "boss" and a person in charge of the operations. Their testimony was corroborated not only by details offered by other co-conspirators, but also by wiretapped calls, telephone records, police surveillance, analysis of appellant's bank records, and examination of the drug notebook found in appellant's bedroom. There is no reasonable likelihood that the instructions, if erroneous, had a significant effect on the jury's verdict.

### II.

Appellant argues that he is entitled to a new trial because the prosecutor engaged in misconduct by interfering with appellant's ability to present a defense and by misstating the law regarding the presumption of innocence. Each claim will be discussed separately.

### 1. Arrest of defense witness

■ Appellant argues that the prosecutor interfered with his ability to call one of his co-conspirators, Rene Tirado, who was seized by law enforcement when he appeared at trial pursuant to a defense subpoena, in violation of Minn.Stat. § 634.08 (2012) (precluding state from ar-

resting witness subpoenaed in criminal case). According to appellant, Tirado would have testified about traveling to Minnesota with appellant to buy vehicles and then returning to California to sell them. On appeal, the state concedes that the prosecutor's conduct in directing Tirado's arrest violated section 634.08, and improperly interfered with appellant's ability to call a defense witness. But the state insists that the interference did not amount to reversible or prejudicial misconduct.

The prosecution violates a defendant's right to call witnesses and present a complete defense when the "interference with a witness's decision to testify is substantial." *State v. Beecroft*, 813 N.W.2d 814, 839–40 (Minn.2012) (reversing murder conviction in interests of justice where prosecutor "threatened to withdraw support" from supervisor unless supervisor "barred" her assistant medical examiner from testifying as defense expert and examiner was not called because it was "understood" that it would be prohibited by her supervisor). Substantial interference occurs when the prosecutor "actively discourages a witness from testifying through threats of prosecution, intimidation, or coercive badgering." *Id.* at 839 (quotation omitted).

The misconduct committed by the prosecutor here is troubling, but falls short of that set out in *Beecroft*. The prosecutor quickly admitted her mistake, released Tirado, and did not attempt to further deter him from testifying. Defense counsel was given free access to Tirado and interviewed him, but decided not to call him to testify. That decision appears to have been tactical, based on a consideration of the potential adverse effect of Tirado's testimony. Had Tirado been called, the prosecutor could have impeached him with a statement he made to police after his initial arrest in February 2012. In that statement, Tirado admitted to police that he stayed with appellant at the Xerxes Court residence, knew other co-conspirators, and was with appellant when they picked up Samorano after the Subaru containing the ten pounds of meth was impounded by police. While it is clear that the prosecutor's initial interference with this defense witness was improper, defense counsel ultimately chose not to call him. The prosecutor's misconduct was not so prejudicial as to entitle appellant to a new trial.

### 2. Comments during closing argument

Appellant next argues that the prosecutor committed misconduct during her closing argument by telling the jury that appellant had "lost" the presumption of innocence and when she referred to the large amount or "mountain" of evidence presented against appellant. Again, the prosecutor's comments are troubling. But along with these comments, the prosecutor also correctly told the jury that appellant "was presumed innocent unless and until proven guilty beyond a reasonable doubt." And the prosecutor's remark about the mountain of evidence was brief, constituting a few words in closing remarks that spanned more than 75 pages of transcript, and was more a comment about the strength of the state's case.

When read in context, the prosecutor's comments "appear[ ] to be that the state had produced sufficient evidence of [appellant's] guilt to overcome the presumption of innocence, not that he was not entitled to the presumption in the absence of proof beyond a reasonable doubt." *State v. Young*, 710 N.W.2d 272, 280–81 (Minn. 2006). In *Young*, the supreme court concluded that the prosecutor's argument was not a misstatement of the law and did not constitute error. *Id.* Similarly, the prose-

cutor's statements here were not a misstatement of the law, when taken in context.

Even if the comments were misstatements, the jury was properly instructed on the presumption of innocence and the state's burden of proof. *See State v. Trimble,* 371 N.W.2d 921, 926–27 (Minn. App.1985) (concluding that error in misstatement of presumption of innocence was harmless where jury received proper instructions), *review denied* (Minn. Oct. 11, 1985). The jury was also instructed that it should disregard any statement of law by an attorney that differs from that made by the court. *See State v. Shoen,* 578 N.W.2d 708, 718 (Minn.1998) (reviewing court will presume that jurors follow the court's instructions). When the instructions are read as a whole and the statements are taken in context, it is unlikely that any misstatements of law by the prosecutor substantially affected the verdict.

## III.

Appellant argues that the *Blakely* sentencing proceedings that resulted in imposition of a 360–month sentence were defective because the sentencing jury was improperly instructed to find aggravating factors, rather than facts, to support the bases for departure. Appellant also argues that the length of the sentence, which equals the statutory maximum for this offense and represents more than three times the presumptive 86–month sentence, is not justified and is unsupported by severe aggravating circumstances.

### 1. Sentencing proceedings

■ "A defendant has the right to a jury trial to determine whether aggravating factors are proved beyond a reasonable doubt." Minn. Sentencing Guidelines cmt. 2.D.102 (2012) (citing *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531,

159 L.Ed.2d 403 (2004)). "If the departure facts are proved beyond a reasonable doubt, the court may exercise its discretion to depart from the presumptive sentence." *Id.* The guidelines provide a nonexclusive list of aggravating factors that may be used as reasons for departure.

Appellant argues that the sentencing jury was improperly instructed to find aggravating factors rather than facts, and that the district court improperly made factual findings to support the aggravating factors. Appellant asserts that a correctly instructed jury would have been asked to determine if the state had proved beyond a reasonable doubt the existence of facts, which the court then could have used to determine whether there were substantial and compelling reasons to depart. Appellant cites *State v. Rourke,* 773 N.W.2d 913, 920, 922 (Minn.2009), and *Carse v. State,* 778 N.W.2d 361, 373 (Minn.App.2010), *review denied* (Minn. Apr. 20, 2010), which involved the aggravating factors of particular cruelty and particular vulnerability. In those cases, the sentences were reversed and the matters remanded for further proceedings because the sentencing juries did not make specific factual findings to support the court's reasons for the departure. *Id.*

The sentencing jury in this case found that appellant's conduct placed a number of people at risk. Appellant notes that this reason cannot support the departure because the jury did not make specific findings and it was unknown precisely what facts the jury considered in reaching its decision. Appellant also argues that this reason cannot support the departure because the risk of harm was not immediately apparent, unlike other cases involving risk to others. We agree that this aggravating factor was not supported by adequate findings by the sentencing jury.

██ The sentencing jury was also asked, consistent with the guidelines, whether this was a major controlled substance crime, and the special verdict language mirrored the guidelines. *See* Minn. Sentencing Guidelines 2.D.3.b(5). The jury found that at least two of the following circumstances were shown here: the offense involved at least three separate drug transactions; the offense involved the manufacture of drugs for use by other parties; the circumstances of the offense reveal that appellant occupied a high position in the drug distribution hierarchy; the offense involved a high degree of sophistication or planning, occurring over a lengthy period of time and involving a broad geographic area; and appellant used his position to facilitate the commission of the offense. The special interrogatory did not—but should have—asked the jury to make a finding on each separate circumstance. *See State v. Rodriguez,* 754 N.W.2d 672, 677 (Minn.2008). The court's failure to do so makes any reliance on this factor improper under *Blakely.*

██ But a departure can be affirmed even if based on a single aggravating factor. *See State v. Vance,* 765 N.W.2d 390, 395 (Minn.2009); *State v. O'Brien,* 369 N.W.2d 525, 527 (Minn.1985). The sentencing jury also found that appellant committed the crime as part of a group of three or more persons who all actively participated in the crime. Minn. Sentencing Guidelines 2.D.3.b(10). Appellant argues that this cannot support a departure because it duplicates an element of the crime of conspiracy. *See State v. Osborne,* 715 N.W.2d 436, 446 (Minn.2006) (holding that "elements of an offense cannot be used as aggravating factors to impose an upward sentencing departure for that same offense"). The crime of conspiracy requires only two participants and only one active participant. Thus, an upward departure can be based on the involvement of three or more active conspirators. *See Rodriguez,* 754 N.W.2d at 683. Because the number of individuals involved in this case is significantly greater than those typically involved in other controlled substance conspiracy crimes, the offense is more serious than the typical crime. The sentencing jury's finding on this factor supports an upward durational departure. *See State v. Misquadace,* 644 N.W.2d 65, 69 (Minn.2002).

### 2. Length of departure

██ A double upward durational departure is generally the "upper limit" of a sentencing departure. *See State v. Evans,* 311 N.W.2d 481, 483 (Minn.1981). A greater than double departure is warranted only in the "rare case" where "severe aggravating circumstances" exist. *Dillon v. State,* 781 N.W.2d 588, 596 (Minn.App. 2010), *review denied* (Minn. July 20, 2010); *see State v. Shattuck,* 704 N.W.2d 131, 140 (Minn.2005).

This may be one of those "rare" cases. The district court noted that "there has never been a meth case this big at the state level, so I have nothing to compare this case to" and that "alone makes this case—makes the case that severe aggravating circumstances exist here." The court also pointed to the large amount of meth seized during the investigation and to the large number of potential users based on that amount. But the sentencing jury was not asked to make these findings or to make any findings that would support "severe aggravating circumstances" to allow the court to impose an upward durational departure greater than double the presumptive guidelines sentence. Because the jury was required to make findings to support the "severe aggravating factors" cited by the district court and to justify a greater-than-double upward departure, ap-

pellant's sentence must be reversed and the matter remanded for further proceedings. *See Rourke,* 773 N.W.2d at 922–23 (holding that district court, in *Blakely* sentencing trial, must submit one or more special interrogatories to jury that ask whether state has proved facts that would provide the district court with substantial and compelling reasons to depart from presumptive guidelines sentence).

On remand, any decision to impose a greater-than-double upward durational departure must be supported by facts found by a sentencing jury. Examples of the facts that might be presented to a jury were recited by the district court during the sentencing hearing when it imposed the 360–month sentence. The court may exercise its inherent authority to impanel a jury on resentencing, but is not compelled to do so if it decides to impose a double upward durational departure under the less-than-severe aggravating facts found by the jury. *See State v. Boehl,* 726 N.W.2d 831, 842 (Minn.App.2007), *review denied* (Minn. Apr. 17, 2007).

## DECISION

The district court's decision that the jury is not required to agree unanimously on which specific overt act appellant or one of his co-conspirators committed in furtherance of the conspiracy did not constitute plain error, when defense counsel acquiesced to the instruction and the instruction accurately reflected unsettled law. The prosecutor's misconduct in interfering with a defense witness and during closing argument was not so prejudicial as to entitle appellant to a new trial. We therefore affirm appellant's conviction.

Because the sentencing jury did not make factual findings on circumstances that would support severe aggravating factors so as to justify a greater-than-double upward departure, appellant's sentence is

reversed and the matter is remanded for resentencing consistent with this decision.

**Affirmed in part, reversed in part, and remanded.**